## ASSOCIATED ELECTRIC COOPERATIVE, INC.
### v.
**Rogers C. B. MORTON, Individually and as Secretary of the Interior and Peter C. King, Individually, and as Administrator of the Southwestern Power Administration, United States of America, (Intervening Defendant),**

**John N. Nassikas et al.**

## ASSOCIATED ELECTRIC COOPERATIVE, INC.
### v.
**Rogers C. B. MORTON, Individually and as Secretary of the Interior and Peter C. King, Individually, and as Administrator of the Southwestern Power Administration,**

**United States of America (Intervening Defendant),**

**John N. Nassikas et al. (Members of Federal Power Commission), Appellants.**

### Nos. 73–1601, 73–1690.

United States Court of Appeals, District of Columbia Circuit.

Argued June 11, 1974.

Decided Nov. 18, 1974.

Rehearing Denied Dec. 16, 1974.

1168

Thomas G. Wilson, Atty., Dept. of Justice, with whom Irving Jaffe, Acting Asst. Atty. Gen., Harold H. Titus, Jr., U. S. Atty., at the time the brief was filed, and Walter H. Fleischer, Atty., Dept. of Justice, were on the brief for appellants Morton, King and the United States. Robert B. Kopp, Atty., Dept. of Justice, also entered an appearance for appellants Morton, King and the United States.

Northcutt Ely, Washington, D.C., with whom Frederick H. Ritts, and James E.

Hickey, Jr., Washington, D.C., were on the brief, for appellee, Associated Electric Cooperative, Inc.

Before MacKINNON and WILKEY, Circuit Judges, and JAMESON,* United States Senior District Judge for the District of Montana.

JAMESON, Senior District Judge:

This is an appeal from a summary judgment in favor of plaintiff-appellee, Associated Electric Cooperative (Associated), against Rogers C. B. Morton, Secretary of the Interior, Peter C. King, Administrator of the Southwestern Power Administration (SPA), the United States of America, and the members of the Federal Power Commission (FPC) in an action to declare unlawful and to enjoin the collection of a transmission service charge imposed by the Secretary and approved by the Commission.

In 1962, pursuant to Section 5 of the Flood Control Act of 1944, 16 U.S.C. § 825s, SPA entered into contracts with Associated for the sale of federal hydroelectric power and energy, at rates set by the Secretary of the Interior, approved by the FPC, and providing for the allowance of credits for services to be performed by Associated in transmitting power and energy for SPA's account. In 1970 the Secretary revised the rate schedule by adding a "transmission service charge" to recover costs incurred by SPA for which SPA claimed it was receiving no commensurate benefit in services from Associated.

Associated then brought this action seeking to enjoin and have declared illegal the Secretary's 1970 modification of the rate schedule, on the ground that the cancellation of credits allegedly due under the 1962 contract was in violation of the Secretary's statutory authority and of the contract. The defendants denied these allegations of the complaint and as an affirmative defense alleged that Associated's contract credits were invalid

because they violated standards contained in the Flood Control Act of 1944. The United States [1] counterclaimed for recovery of the transmission service charges as set forth in the modified rate schedule.

Both sides moved for summary judgment. The district court granted Associated's motion in a brief order stating that the court had concluded "that the defendants' actions were unlawful in that:

1. The Tranmission Service Charge imposed by defendants on plaintiff is not a rate revision authorized by Section 5 of the Flood Control Act of 1944 or other statute; and

2. Defendants are not authorized by law to unilaterally reduce the amounts contractually owed to plaintiff for its transmission services; and

3. Defendants' action were arbitrary, capricious and an abuse of discretion".

*Flood Control Act of 1944*

The Flood Control Act of 1944 (58 Stat. 890) provides in Section 5 (16 U.S.C. § 825s) that hydroelectric power produced by certain Army dams "shall be delivered to the Secretary of the Interior" for disposal by him "in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles, the rate schedules to become effective upon confirmation and approval by the Federal Power Commission. Rate schedules shall be drawn having regard to the recovery * * * of the cost of producing and transmitting such electric energy". The Act provides further that "Preference in the sale of power and energy shall be given to public bodies and cooperatives", and the Secretary is authorized to construct or acquire only such transmission facilities as may be necessary to make the

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Initially Morton, King and the members of the Federal Power Commission were named as defendants. The United States was granted leave to intervene as a defendant.

power and energy "available in wholesale quantities for sale on fair and reasonable terms" to facilities owned by others.

### Contracts Prior to 1962

SPA was designated as the marketing agent for the sale of power and energy pursuant to Section 5 of the Flood Control Act of 1944. Initially, SPA proposed to construct extensive facilities, including a transmission system, but this approach was rejected by Congress in 1946.[2] The Administrator of SPA then entered into negotiations with representatives of various distribution cooperatives in Missouri concerning a proposal whereby generation and transmission cooperatives (G & Ts) would be organized to construct transmission facilities and steam-generating plants with funds borrowed from the Rural Electrification Agency (REA). As a result of these negotiations, during 1949–1951 SPA, with the approval of the Solicitors of the Department of the Interior and the Department of Agriculture, entered into a series of 40-year contracts with six Missouri G & Ts and others.

The contracts contained three interrelated agreements: (1) by loan contracts, REA was to loan funds to the G & Ts for the construction of generating and transmission facilities; (2) by lease contracts, SPA was to lease for 40 years the transmission facilities to be constructed with the loans and to pay all costs of operation, maintenance, repair and capital replacements, as well as amortization payments on the loans; and (3) by power contracts, SPA was to purchase the entire output of the steam plants to be constructed and in turn to resell to each of the G & Ts their power and energy requirements.[3] Congress, expressing its approval of the plan, established a "continuing fund" out of which the Secretary was authorized to make expenditures, including expenditures for rentals of transmission lines.[4] Congress appropriated funds for this purpose until 1954.

The operation of these contracts was suspended during fiscal years 1954 and 1955 when Congress withheld appropriations. In 1956 Congress resumed appropriations and reactivated the lease contracts. In doing so the House Committee on Appropriations instructed the Secretary that the contracts should be amended to provide that (1) G & Ts would operate and maintain their own transmission system under lease to SPA; (2) SPA and G & Ts would settle accounts for power sold on the basis of net balances, that is, the bill for power sold would be reduced by credits to the G & Ts for their costs of operating and maintaining the transmission facilities; and (3) power and energy would be delivered to the load centers at all G & T contracting systems at the "basic SPA rate".[5] The amendments were made pursuant to the Congressional instructions.

### 1962 Contract Between SPA and Associated

It was subsequently recognized that the existing contracts might not be adequate to fulfill the G & Ts' power requirements. Accordingly they were superseded in 1962 by a new contract between SPA and Associated. Associated was created in 1961 as a master cooperative, composed of the Missouri G & Ts, for the purpose of consolidating their loads and facilities and building new generation facilities.

Under the 1962 SPA-Associated contract, SPA sells to Associated under the

---

2. See 92 Cong.Rec. 7186–7200.

3. In a suit by private utility companies the Secretary's authority to enter into these agreements was sustained in Kansas City Power & Light Co. v. McKay, 115 F.Supp. 402, 407–408 (D.D.C.1953), judgment vacated for lack of plaintiffs' standing to sue, 96 U.S.App.D.C. 273, 225 F.2d 924, cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955).

4. 16 U.S.C. § 825s–1.

5. House Committee on Appropriations in its Report to Accompany T.R. 6766, the Public Works Appropriation Bill for F.Y. 1956 (H. R.Rep.No.747, 84th Cong., 1st Sess. pp. 5–6.

applicable rate schedule (P–2)[6] 288 megawatts of peaking power, plus all of the energy generated at the Table Rock and Bull Shoals power plants less certain reserve quantities. The contract specifies that rates may be increased or decreased by SPA, subject to approval of the FPC.[7]

The contract requires Associated to provide certain services to SPA, including transmission, reserves, power and energy losses and operation and maintenance of certain isolated SPA facilities. As consideration for these services, Associated is to receive the following credits:

| "Contract Credits to Associated | Annual Payments |
|---|---|
| 1. Transmission Service | |
| *161 kv (Existing) | $1,099,000 |
| *161 kv (New Facilities) | 516,000 |
| 69 kv (SPA's Customers) | 278,000 |
| 2. Power and Energy Transmission Losses (10%) | |
| *Capacity | 777,000 |
| *Energy | 256,000 |
| 3. Reserve Generation (Standby) | 1,152,000 |
| 4. Suspension [of] Contracts (Power Plants) | 493,000 |
| 5. Operation and Maintenance, SPA Isolated Facilities | 85,000 |
| TOTAL | $4,656,000" |

The Secretary reported the new contractual arrangements to Congress. Congress continued to appropriate money to the "continuing fund" to cover, among other items, the cost for rental and use of transmission facilities.

During the period between 1962 and the time of this action, the Associated-SPA contract came under sharp criticism from other government agencies. The Federal Power Commission repeatedly expressed concern that SPA was failing to meet the requirements of the Flood Control Act—that "rate schedules shall be drawn having regard to the recovery of the costs of producing and transmitting such electric energy, including the amortization of the capital investment * * *". The contract credits allowed Associated were singled out as the primary cause.[8]

*Revised Rate Schedule in 1970*

In 1969 appellant King was appointed Administrator of SPA. From a study of the marketing of SPA's power and energy, he found that rather than recovering the cost of Government facilities, as required by the Act of 1944, SPA was in fact losing money and that the largest part of the loss resulted from the SPA-Associated contract. Based upon a report of the SPA staff, he determined that SPA had received little benefit from the services for which Associated was credited, and that the credits accordingly were a cost to SPA which was not being recovered.

The Administrator concluded that the loss in revenue and failure to recover costs could not be justified under the directive of the Flood Control Act of 1944. Accordingly he prepared a revised Rate Schedule P–2 which included a new charge for transmission of power and energy to points beyond SPA's high voltage grids. There were no other cus-

6. The P–2 Rate Schedule provides for a demand charge for high voltage delivery of $14.40 per kilowatt per year and an energy charge of 2 mills per kilowatt hour.

7. Besides the contract between Associated and SPA, four other related contracts were executed at approximately the same time. One agreement suspends the contracts between SPA and the Missouri G & Ts unless the SPA-Associated contract is terminated prior to July 1, 1995 in which case the suspended contracts are revived. Others include a contract by SPA with three Missouri utility companies under which it sells them 190 megawatts of capacity with 1200 hours of energy under the P–2 Rate Schedule; a contract between Associated and the utility companies; and contracts between Associated and its six members.

8. 40 F.P.C. 291, 295 (1968).

tomers besides Associated to whom the new transmission service charge was applicable. This charge effectively eliminated the credit items marked with an asterisk on the chart set forth *supra.*

The Secretary concurred in the Administrator's action and submitted the revised rate schedule to the FPC on January 30, 1970. On May 28, 1970, the FPC issued an order confirming the new schedule and denying Associated's petition for intervention and request for a full hearing. The relevant appropriation subcommittees of each House of Congress were made aware of the new transmission service charge, but no action was taken by Congress with respect thereto.[9]

In July, 1970, the SPA began to bill Associated for the new transmission service charge. Associated refused to pay the new charge and challenged its imposition by instituting this action on August 12, 1970.

### Contentions of Appellants

In urging reversal of the order granting summary judgment in favor of Associated, appellants contend that:

(1) the transmission service charge represents a valid exercise of the Secretary's rate-making powers under the Flood Control Act of 1944;

(2) (a) the transmission service charge is consistent with the contract between Associated and SPA, but (b) if the contract credits and the service charge are inconsistent, then the service charge, which is an exercise of the Secretary's rate-making power, must prevail;

(3) the Secretary's exercise of his rate-making authority is not subject to judicial review;

(4) even if judicial review is found to exist, the service charge is not discriminatory, arbitrary or capricious;

(5) it was not necessary for the FPC to hold a formal evidentiary hearing prior to approving the rate change by the Secretary;

(6) by reason of the foregoing, summary judgment should have been entered in favor of the defendants; but

(7) in the alternative, the court erred in granting summary judgment in favor of Associated because there were disputed issues of fact "as to whether the credits were non-existent or grossly overruled and therefore illegal under the statute".

### Validity of Secretary's Action Under Rate-Making Power of Flood Control Act

The Flood Control Act of 1944 specifically authorizes the Secretary of the Interior to dispose of power produced "at reservoir projects under the control of the Department of the Army . . . at the lowest possible rates to consumers consistent with sound business principles, . . . having regard to the recovery . . . of the cost of producing and transmitting such electric energy . . .". 16 U.S.C. § 825s. Appellants contend that transmission expenses are costs which the statute au-

---

9. The committees were advised by the Administrator during the 1970 hearings of the filing of the proposed rate with the FPC. Hearings, Senate Committee on Appropriations, Public Works, etc., Appropriations for 1971, 91st Cong., 2d Sess. ser. 26, pt. 3 at 331, 368 (1970); Hearings, House Committee on Appropriations, Public Works, etc., Appropriations for 1971, 91st Cong., 2d Sess., ser. 41, pt. 3 at 999–1000 (1970). The rate increase was also mentioned to the committees the following year. Hearings, House Committee on Appropriations, Public Works, etc., Appropriations for 1972, 92nd Cong., 1st Sess., pt. 2 at 773–744 (1971). At the House committee hearings on the 1973 appropriations bill, the Administrator advised the committee of the status of this suit. Hearings, House Committee on Appropriations, Public Works, etc., Appropriations for 1973, 92nd Cong., 2d Sess., ser. 38 pt. 3 at 765 (1972). And in 1973, he gave the Senate Committee a similar report and generally discussed the rate to Associated. Hearings, Senate Committee on Appropriations, Public Works, etc., Appropriations for 1974, 93rd Cong., 1st Sess., pt. 3 at 3181–3184 (1973).

thorizes and mandates the Secretary to recover, and accordingly, in making the revised rate schedule, the Secretary was merely complying with the directives of the Flood Control Act.

On the other hand, Associated contends that Congress has limited the Secretary's rate-making authority in various appropriation acts which in effect constitute *de facto* amendments to the Flood Control Act of 1944. Associated refers to reports of Congressional appropriation committees in 1950, 1951, 1956, and 1962–66 authorizing and directing the Secretary to enter into contracts with the cooperatives, whereby the cooperatives, with loans from REA, would construct transmission lines. The Secretary in turn was to agree to lease the lines and compensate the cooperatives in an amount sufficient to service the REA loans and cover operating costs. The Secretary was also directed to deliver power over the lines of the cooperatives to their load centers at the "basic SPA rate".[10]

Associated argues that Congress in appropriating funds to implement the committee reports ratified the directives of the committees and gave them the force of law. It is Associated's position that in establishing the transmission service charge, appellants effectively eliminated the rentals directed to be paid Associated, and also that appellants are billing Associated at a rate in excess of the "basic SPA rate". In essence Associated contends that Congress in appropriating funds to cover deficits incurred by SPA manifested approval of SPA's failure to attempt to recover costs as required by the Flood Control Act.

We cannot agree with the reasoning of Associated. In the first place, no cases hold that legislative histories carry the force of law. On the contrary, In re Evans, 146 U.S.App.D.C. 310, 452 F.2d 1239, 1245 (1971), cert. denied, 408 U.S. 930, 92 S.Ct. 2479, 33 L.Ed.2d 342 (1972) holds that "[w]hile [committee] reports are unquestionably entitled to weight in determining the purpose of a statute they are neither enacted by Congress nor signed by the President, and thus they do not have the force of legislation."

 Furthermore, simply because Congress ultimately enacted legislation appropriating funds to implement the contractual scheme between SPA and the cooperatives gives no greater weight to the committee reports. While it is true that appropriations in some instances may constitute ratifications, it is also clear that ratification by appropriation will not be found unless prior knowledge of the specific disputed action can be clearly demonstrated, D.C. Federation of Civic Associations v. Airis, 129 U.S.App.D.C. 125, 391 F.2d 478, 482 (1968) and the appropriation plainly shows "a purpose to bestow the precise authority which is claimed". Ex parte Endo, 323 U.S. 283, 303 n. 24, 65 S.Ct. 208, 219, 89 L.Ed. 243 (1944).[11]

 It is anything but clear that the Congressional committees or Congress as a whole had any intent to require as a matter of law that the Secretary sell power at less than cost contrary to the explicit directive of Section 5 of the Flood Control Act.[12] The mere fact

---

10. While the House Committee on Appropriations spoke of power being delivered at the "basic SPA rate" (H.R.Rep.No.747, 84th Cong., 1st Sess., pp. 5–6 (1955)), it is significant that in its report, the conference committee called for delivery of power to the G & Ts "at the basic SPA rate" "*if practical*", (H.R.Rep.No.1085, 84th Cong., 1st Sess., p. 4 (1955)) (emphasis added). The addition of the phrase "if practical" indicates that the committee instructions were not as binding as Associated contends.

11. Moreover, the rules of each House of Congress expressly provide that appropriation bills are not to include general legislation. Rule XVI, paras. 2, 4, Standing Rules of the Senate, Rules and Manual, United States Senate, 84th Cong. (1955) ; Rule XXI, para. 2, Rules of the House of Representatives, Rules and Manual, House of Representatives, 84th Cong. (1955).

12. "* * * [R]epeals by implication are not favored. When there are two acts upon

that Congress appropriated funds to cover previous deficits of SPA is not inconsistent with SPA's attempt to recover costs in the future. Congress has been advised of the imposition of the transmission service charge since 1970, but there is nothing in the record to indicate that Congress or any of its committees has ever suggested that the charge is illegal or improper.[13] We find nothing in the actions of Congress which has limited the rate-making authority of the Secretary under the Flood Control Act of 1944.

Associated next contends that the Flood Control Act itself does not authorize the Secretary to impose the transmission service charge. Associated points out that the Act gives the Secretary authority to make three kinds of contracts (1) power sale contracts, (2) power purchase contracts, and (3) contracts to acquire transmission lines.[14] Associated argues that the Secretary's rate-making power applies *only* to power sale contracts. Associated admits that the 1962 contract has a power sale aspect. It contends, however, that the contract provision for transmission services is not a part of the power sale but rather involves the acquisition of transmission facilities. The Secretary, therefore, has no authority to unilaterally reduce the stipulated rental payments made by SPA.

This contention of Associated is without merit. Under the terms of the 1962 SPA-Associated contract, the Secretary acts in a dual capacity. He not only leases the transmission lines from Associated, but also utilizes the transmission lines to deliver electrical power and energy to Associated. Thus, two separate contractual obligations are involved. The Secretary agrees that in his capacity as lessee of the transmission lines, he cannot unilaterally alter the agreed lease

price. Were the relationship of SPA to Associated only that of a lessee to a lessor there would be merit in Associated's contention that the Secretary's action was violative of the contractual provisions, as well as ultra vires under applicable federal law. This, however, is not the case. The Secretary also sells power and energy to Associated. Section 5 of the Flood Control Act expressly provides that the rates imposed with respect to a sale of power must be adequate to recover the cost of both providing and transmitting the power. The imposition of the transmission service charge thus falls within the Secretary's rate-making authority.

*Validity of Transmission Service Charge Under 1962 Contract*

The 1962 SPA-Associated contract incorporated the statutory rate-making authority of the Secretary under the Flood Control Act. The contract states:

"The rates set forth in the said Rate Schedule P-2, or the rates in any superseding rate schedule may be increased or decreased by SPA from time to time subject to the confirmation and approval by the Federal Power Commission . . . .".

Having concluded that the imposition of the transmission service charge was within the statutory rate-making authority of the Secretary, it is our opinion that the charge was also authorized by the terms of the 1962 contract between SPA and Associated.

Associated argues that even if the transmission service charge is a revision of the rate schedule, "it is an attempt to make the cooperatives pay twice for the same service because the contract rate [of $14.40 per kilowatt per year which has not been changed] includes trans-

the same subject, the rule is to give effect to both if possible. * * * The intention of the legislature to repeal 'must be clear and manifest'". United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939).

13. See note 9 *supra*.

14. Associated relies on a construction given Section 5 in a Solicitor's Opinion, July 15, 1949, 95 Cong.Rec. 11449 (1949).

mission to the same points of delivery for which SPA would now charge them a second time".

██ The plaintiff's argument misconstrues the nature of the Secretary's rate-making power. The point of delivery of the power or energy is as much a part of the rate schedule as is the price per kilowatt per year. The 1962 P-2 rate schedule stated that "Delivery of hydro and/or seasonal peaking power service will be from, and at the voltage of the 138 kv or the 161 kv *transmission systems owned by or available to SPA . . .* ". (emphasis added). The revised schedule's prices per kilowatt per year include transmission *only as far as the SPA high voltage grid.*[15] In other words, the $14.40 rate does not recover costs of transmission beyond the SPA high voltage grid. Costs of transmission beyond that grid are recovered by the new transmission charge.[16] This change in the condition of the service constitutes an exercise of the Secretary's rate-making power and is thus authorized both by the Flood Control Act and the SPA-Associated contract.

We conclude that the contract between SPA and Associated does not preclude the imposition of the transmission service charge.[17]

### Judicial Review of Rate-Making

██ The Administrative Procedure Act of 1946 "embodies the basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute,' 5 U.S.C. § 702, so long as no statute precludes such relief or the action is not one committed by law to agency discretion, 5 U.S.C. § 701(a)". Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Id.* In Data Processing Service v. Camp, 397 U.S. 150, 156–157, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970), the Court in quoting from a House Report at the time of the passage of the Administrative Procedure Act stated:

"The statutes of Congress are not merely advisory when they relate to administrative agencies, any more than in other cases. To preclude judicial review under this bill, a statute, if not specific in withholding such review, must upon its face give clear and convincing evidence of an intent to withhold it. The mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review. H.R.Rep. No. 1980, 79th Cong., 2d Sess., 41."

██ Appellants argue that there is no right of judicial review by reason of the provision in 5 U.S.C. § 701(a)(2) that judicial review shall not apply to "agency action * * * committed to agency discretion by law". This exception has been characterized by the Supreme Court as a "very narrow" one. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). "The legislative history of the Administrative Pro-

---

15. We agree with appellants that "What the transmission service charge does * * * is change the point at which SPA begins to *charge* for the costs incurred in the delivery of the power and energy".

16. Because of the credits received by Associated, SPA incurs costs of transmission beyond the high voltage grid. Other customers of peaking power take it from SPA's high voltage grid and as to them SPA incurs no cost of transmission beyond its grid.

17. Even assuming that the transmission charge were precluded by the terms of the SPA-Associated contract, the transmission charge is nevertheless within the Secretary's rate-making power under the Flood Control Act. It is well settled that a Government agency cannot contract in derogation of its statutory powers. *See* United States v. City and County of San Francisco, 310 U.S. 16, 28, 60 S.Ct. 749, 84 L.Ed. 1050 (1940).

cedure Act indicates that it is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' S. Rep.No.752, 79th Cong., 1st Sess. 26 (1945)." *Id.*

The construction of the Flood Control Act of 1944 and the 1962 contract between SPA and Associated requires legal as well as factual determinations. Given the narrowness of the exception and the presumption of reviewability, we conclude that the agency action here, although it involves rate-making,[18] is not "committed to agency discretion by law" and is therefore subject to judicial review.

### Were Actions Arbitrary, Capricious and an Abuse of Discretion?

Associated argues, and the district court held, that defendants' actions were arbitrary, capricious and an abuse of discretion. This contention is answered in large part by our conclusion that the imposition of the transmission service charge was a proper exercise of the Secretary's power. In proposing the rate revision to the FPC, the Secretary, as indicated in the affidavits in support of defendants' motion for summary judgment, relied upon a Rate and Repayment Study dated January, 1970 and upon the expert opinion of the power engineers of his staff. It cannot be contended that the Secretary acted in a vacuum. Simply because other reports and studies were available and ignored by the Secretary does not make his actions arbitrary or capricious.

Moreover, the fact that Associated was the only customer of SPA [19] that was affected by the rate revision does not necessarily make the transmission charge discriminatory. A rate distinction between those companies which take their power directly from the high voltage grid of SPA and those which require delivery of power by SPA beyond SPA's high voltage grid is not unreasonable.

Associated further argues that the action of the Federal Power Commission in denying its petition to intervene and request for a hearing was arbitrary, capricious and an abuse of discretion. The court disagrees. A "rule" is defined by the Administrative Procedure Act to include " . . . approval or prescription for the future of rates, . . . ". 5 U.S.C. § 551(4). Having determined that the imposition of the transmission service charge was an exercise of rate-making power of the Secretary, we conclude that the action of the FPC in approving the proposed charge constituted rule-making. A formal evidentiary hearing is not required in rule-making proceedings. United States v. Florida East Coast Railway, 410 U.S. 224, 93 S.Ct. 810, 818, 35 L. Ed.2d 223 (1973).

In addition, the Administrative Procedure Act provides that a hearing is not required where there is involved "a matter relating to * * * public property". 5 U.S.C. § 553(a)(2). Here the FPC was concerned with a rate revision on the sale of public power, and its action was exempt from the notice and

---

18. Appellants rely heavily on Panama Canal Co. v. Grace Lines Inc., 356 U.S. 309, 78 S. Ct. 752, 2 L.Ed.2d 788 (1958) which held that the "initiation of a proceeding for readjustment of the tolls of the Panama Canal is a matter that Congress has left to the discretion of the Panama Canal Co." *Id.* at 317, 78 S.Ct. at 757. The case was concerned with the failure to initiate new rate-making and the Court held that judicial review was precluded. The Court noted, however, that "We do not say, for we are not called upon to do so, that no justiciable issue can arise out of the toll-making procedure for the Panama Canal. All we hold is that the controversy at present is not one appropriate for judicial action". *Id.*

19. At the hearing on appeal, the Secretary stated with respect to the discrimination contention that one other SPA customer, the City of Hermann, now pays a charge for transmission beyond the high voltage grid.

hearing requirements of § 553. The denial of Associated's petition to intervene and request for a hearing accordingly was not error.

## Summary Judgment

■ While appellants contend that summary judgment should have been entered in their favor, they recognize that if the actions of the Secretary and the Commission are subject to judicial review, there are genuine issues of material facts to be resolved which preclude summary judgment.[20]

In contending that the transmission service charge was not authorized, Associated argues that the intended effect of the charge was to wipe out the agreed compensation of Associated (through credits) for transmitting SPA power for the account of SPA. On the other hand, SPA contends that the "credits" were either nonexistent or grossly over-valued and therefore illegal under the Flood Control Act.

Appellants rely on affidavits (with detailed specifications) of the Administrator of SPA and its power expert to support their claim that the "public is being required to subsidize Associated to the extent of millions of dollars a year" by reason of the "lack of value of each of the 'services' supplied by Associated to SPA". The findings and conclusions of appellants' experts are disputed in an equally detailed affidavit of Associated's power expert. The opposing affidavits present disputed issues of fact of a highly technical and complex nature which cannot be resolved through summary judgment.

Specifically, there is a factual dispute with respect to Associated's contention that it uses only 52% of the power and energy it is required to transmit over its lines.[21] Associated claims that under its contract with SPA it is obligated to transmit the remainder of the power (approx. 48%) to three power companies, six municipalities and the Bureau of Reclamation. Nevertheless, according to Associated, the Secretary by imposing the transmission service charge requires Associated to bear 100% of the cost of transmission.

The appellants point out that Associated continues to receive $278,000.00 for transmitting power to the municipalities. With respect to the three private utilities and the Bureau of Reclamation, appellants claim that either Associated provides no transmission service or the transmission service is nominal and warrants no consideration. The extent of the transmission services performed by Associated for SPA is a question of fact material to a determination of the reasonableness of the Secretary's action.

There are genuine issues of material facts which preclude summary judgment for either appellee or appellants.

Reversed and remanded.

---

20. The principles governing summary judgment were reviewed by this court in Leonard v. BHJK Corporation, 152 U.S.App.D.C. 97, 469 F.2d 108, 110 (1972), where the court stated in part:
 "The movant has the burden of clearly demonstrating the absence of any genuine issues as to all of the material facts applicable under his theory of the law, and a party opposing summary judgment is entitled to the benefit of all favorable inferences that may be drawn from the evidence. The court may not weigh or resolve issues." (citations omitted).
 *Accord,* Wright and Miller, Federal Practice and Procedure: Civil § 2712, (1973); Weiss v. Kay Jewelry Stores Inc., 152 U.S.App.D. C. 350, 470 F.2d 1259, 1261–1262 (1972).

21. A substantial part of the oral argument before the district court was devoted to this issue.