Eva **WILSON, et al., and Association of Village Council Presidents, et al.,** Plaintiffs-Appellants,

v.

James G. **WATT, Secretary of the Interior, et al., Defendants-Appellees.**

Nos. 82–3364, 82–3414.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 7, 1983.

Decided April 5, 1983.

As Amended on Denial of Rehearing June 16, 1983.

---

Kathleen Strasbaugh, Alaska Legal Services Corp., Anchorage, Alaska, Bertram E. Hirsch, Floral Park, N.Y., for plaintiffs-appellants.

Maria Iizuka, Washington, D.C., for defendants-appellees.

Before SKOPIL, PREGERSON, and FERGUSON, Circuit Judges.

SKOPIL, Circuit Judge:

Alaska Native tribal organizations and class plaintiffs appeal the district court's denial of a preliminary injunction against the termination by Bureau of Indian Affairs of the Snyder Act general assistance program in Alaska on two weeks notice. The Alaska Natives contend the district

court's assessment of the merits was based on erroneous legal and factual conclusions. We agree and reverse.

## BACKGROUND

The Snyder Act of 1921, 25 U.S.C. § 13 (1976), authorizes the Bureau of Indian Affairs ("BIA"), under the supervision of the Secretary of the Interior, to expend monies appropriated by Congress for the benefit, care and assistance of Indians throughout the United States for stated purposes, including general support, education and relief of distress.[1] *See Morton v. Ruiz*, 415 U.S. 199, 205–06, 94 S.Ct. 1055, 1059–60, 39 L:Ed.2d 270 (1974). The BIA regulations implementing the Snyder Act provide for the federal general assistance program at issue in this case. 25 C.F.R. § 20.21 (1982).[2] The general assistance program is available to needy Indians, 25 C.F.R. §§ 20.1(s), 20.20 (1982), who are ineligible for other federal assistance and who reside in states where comparable general assistance is not available or is not being provided to all residents on the same basis. 25 C.F.R. § 20.21(b), (c) (1982).

Since 1939 the BIA has provided cash payment general assistance to Alaska Natives to meet basic living necessities.[3] At the time of these suits, approximately 3400 Alaska Natives were receiving general assistance as their only source of income directly from BIA or through tribal organizations contracting with BIA for administration of the funds pursuant to contracts authorized by the Indian Self-Determination and Education Assistance Act.[4] *See* 25 U.S.C. §§ 450–450n (1976); 25 C.F.R., Pt. 271 (1982).

Congress has funded the general assistance program in Alaska through Department of Interior appropriations acts which generally describe the programs to be funded and state the amount appropriated. *Ruiz*, 415 U.S. at 207, 94 S.Ct. at 1060. The appropriations act at issue here, Act of December 23, 1981, Pub.L. No. 97–100, 95 Stat. 1399, covered fiscal year 1982, October 1, 1981 through September 30, 1982. The Act specifically addresses appropriations to some Indian programs, but does not address programs for Alaska Natives.

In March 1982, BIA sent letters to all recipients terminating their general assistance as of April 1, 1982. Although the letters were dated March 5, they were not received until after March 15th. The letter stated purported congressional and presidential authority to terminate the program. It also said the State of Alaska had been notified of the termination and would prob-

---

1. The Snyder Act provides in pertinent part:
 The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes:
 General support and civilization, including education.
 For relief of distress and conservation of health.
 For industrial assistance and advancement and general administration of Indian property. . . .
 25 U.S.C. § 13 (1976) (Act of November 2, 1921, Ch. 115, 42 Stat. 208).

2. Section 20.21 provides:
 General assistance.
 Indians meeting the requirements prescribed in § 20.20(a) shall be considered eligible for general assistance under this part: *Provided,* That:
 (a) Their resources do not meet their need.
 (b) They do not receive and are not eligible to receive public assistance or Supplemental Security Income payments and are not included in such payments made to others. However, otherwise eligible Indians may receive general assistance under this part upon application for and pending initial receipt of such payments.
 (c) They reside in areas where comparable general assistance is not available or is not being provided to all residents on the same basis from a State, county or local public jurisdiction.
 (d) They accept available employment which they are able and qualified to perform.
 25 C.F.R. § 20.21 (1982).

3. Letter from Jacob Lestenkof, Area Director, Bureau of Indian Affairs, Juneau Area Office to "Whom It May Concern" (Mar. 8, 1982).

4. Impact Analysis Statement attached to letter from Jacob Lestenkof (Mar. 8, 1982). *See supra* note 3.

ably be able to provide assistance. The recipients received letters from the Alaska Department of Health and Social Services, dated March 24, 1982, describing the state's general relief assistance program. The letter stated that the State General Relief Assistance program is limited to emergency aid, provides substantially less aid than the federal program, and would not provide direct cash assistance. The letter also warned of delay in receiving aid because of the large number of anticipated applications.

## PROCEEDINGS BELOW

### A. *Wilson v. Watt*

On March 30, 1982 Wilson and other Alaska Natives brought a class action in the United States District Court of Alaska on behalf of all Alaska BIA general assistance recipients seeking declaratory, injunctive and mandamus relief against the termination of program. They asserted violations of the Administrative Procedure Act, the Snyder Act, BIA regulations, the fifth amendment, and trust relationship of the United States government to the Indians. The plaintiffs moved for a temporary restraining order and a preliminary injunction. On April 5 the district court filed its order denying the motions for the TRO and preliminary injunction, and on April 13 filed findings of fact and conclusions of law.

### B. *Association of Village Council Presidents v. Watt*

On April 12, 1982 the Association of Village Council Presidents ("AVCP"), other tribal organizations, and individual Alaska Natives also filed a class action on behalf of all Alaska Native general assistance recipients in the District Court for the District of Columbia, seeking to prevent the termina-

5. The government moved to dismiss the *Wilson v. Watt* appeal on the ground of untimely notice of appeal. That motion was referred to this merits panel because of the consolidation. The class of individual plaintiffs, all Alaska Native general assistance recipients, is the same as that in *AVCP v. Watt,* and the issue on appeal is the same with respect to that class.

tion of the program. These plaintiffs made the same claims as those in *Wilson v. Watt.* The tribal organization plaintiffs also asserted that funds for contracts entered pursuant to the Indian Self-Determination and Education Assistance Act were preserved by the 1982 Appropriations Act. The case was transferred to the Alaska District Court, and on May 11, 1982 that court denied appellant's motion for a temporary restraining order and preliminary injunction. The decision incorporates the findings in *Wilson v. Watt.* AVCP appealed pursuant to 28 U.S.C. § 1292(a). This court consolidated the appeals. *See* Fed.R.App.P. 3(b).[5]

## STANDARD OF REVIEW

 The grant or denial of a preliminary injunction should be reversed only if the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Beltran v. Myers,* 677 F.2d 1317, 1319 (9th Cir.1982); *Aleknagik Natives Ltd. v. Andrus,* 648 F.2d 496, 501 (9th Cir.1980). Applying an incorrect legal standard for preliminary relief is an abuse of discretion, *Wright v. Rushen,* 642 F.2d 1129, 1132 (9th Cir.1981); *Aguirre v. Chula-Vista Sanitary Service,* 542 F.2d 779, 780–81 (9th Cir.1976). The district court also errs if, in applying the appropriate legal standards, the court misapprehends the law with respect to the underlying issues in litigation. *Sports Form, Inc. v. United Press International, Inc.,* 686 F.2d 750, 752 (9th Cir.1982); *Wright,* 642 F.2d at 1132.

We conclude that the district court made erroneous findings of fact and misapprehended the law applicable to assessing the merits of Alaska Natives' claims. Accordingly, we state and apply the proper standard for preliminary relief.[6] *See Aleknagik Natives,* 648 F.2d at 502–04.

Thus, we find the cases merge on the issue with respect to the individual recipients and we need not decide whether *Wilson v. Watt* should be dismissed. *See generally* 9 J. Moore, B. Ward & J. Lucas, Moore's Federal Practice ¶¶ 203.13–203.15 (1982).

6. Appellants also argued that the district court

## THE STANDARD FOR PRELIMINARY RELIEF

 The moving party meets its burden by demonstrating either "a combination of probable success on the merits and the possibility of irreparable injury" or "that serious questions are raised and the balance of hardships tips sharply in its favor." *Sports Form,* 686 F.2d at 753. The principles are extremes of a single continuum. *Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir.1978). The critical element is the relative hardship to the parties. If the balance of hardships tips decidedly toward the plaintiff, less likelihood of success on the merits is required. *Id.* Plaintiffs must show the "irreducible minimum" of some chance of success on the merits. *Sports Form,* 686 F.2d at 753.

## BALANCE OF HARDSHIPS

 Plaintiffs must show some injury in the first instance, *Los Angeles Memorial Coliseum v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980), and that the balance of hardships tips in their favor. *Aleknagik Natives,* 648 F.2d at 504. The Alaska Natives and tribal organizations have met this burden.

The district court made no express finding regarding the balance of hardships. The relevant findings of fact, however, which were largely uncontested, support our conclusion that the balance tips sharply in favor of the Alaska Natives. Approximately 3400 Alaska Natives received BIA general assistance as their sole income for living necessities. Many recipients received their assistance through BIA–AVCP contracts to administer the funds which were terminated without the procedure required by the BIA regulations. The district court

concluded that "[t]he plaintiffs have the needs specified in their affidavits ...." and that BIA officials had no intention of continuing the general assistance program after April 1, 1982. The court also found that $1.7 million of the $4 million 1982 appropriation remained unspent.

Alaska did not have a comparable general assistance program. There is no indication in the record that such a program would be implemented by Alaska. Whatever aid Alaska could provide would not be available promptly or expeditiously. Since there were appropriated, unspent funds, hardship to the Bureau of Indian Affairs was minimal. On the other side, many Alaska Natives faced termination of general assistance on very short notice. The balance of hardships tips sharply in their favor.

## ASSESSMENT OF THE MERITS

The individual recipients assert Congress did not intend to terminate the general assistance program on April 1, 1982 unless Alaska had implemented a comparable program. The tribal organizations assert that the Appropriations Act expressly preserved funds for the AVCP–BIA contracts to administer general assistance until September 30, 1983. There is merit to both contentions and the district court erred in concluding plaintiffs had no chance of success.

### A. *Tribal Organization Contract Claims*

Since 1977, AVCP and other Alaska tribal organizations have contracted with BIA for administration of general assistance funds to tribal communities pursuant to the authority of the Indian Self-Determination Act, 25 U.S.C. § 450f–n (1976).[7] Section 450f(a) provides:

> The Secretary of the Interior is directed, upon the request of any Indian tribe, to

---

applied an incorrect standard for preliminary relief, or in the alternative, failed to apply the standard properly. Since we conclude the assessment of merits was in error and apply the proper standard, we need not decide these issues.

**7.** The Indian Self-Determination and Education Assistance Act was enacted January 4, 1975,

and includes sections 13a, 450–450n, 455–458e of Title 25, as well as other sections of the Code. Pub.L. No. 93–638, § 1, 88 Stat. 2203 (1975). Sections 450f–450n of Title 25 are generally cited as the Indian Self-Determination Act. Pub.L. No. 93–638, Title I, § 101, 88 Stat. 2206 (1975).

enter into a contract or contracts with any tribal organization of any such Indian tribe to plan, conduct, and administer programs, or portions thereof . . . which the Secretary of the Interior is authorized to administer for the benefit of Indians under sections 13 and 52a of this title and any act subsequent thereto [Snyder Act]. . . .

25 U.S.C. § 450f(a) (1976).

The AVCP administered Snyder Act general assistance funds pursuant to such contracts to many tribal communities in remote areas, serving some 1700 persons. The contracts were to run until September 30, 1983. Procedures for entering contracts, modifying contracts, and terminating contracts as promulgated by the BIA are contained in 25 C.F.R. §§ 271.11–.28; 271.61–.66 (1982). The contracts were terminated without notice or procedures required by the BIA regulations on April 1, 1982.

The district court heard no oral argument on AVCP's motion for preliminary injunction, and issued its order stating: "Plaintiffs' arguments based on 25 U.S.C. § 450 et seq. [Indian Self-Determination Act] are inapposite for the reason that general assistance payments are not within the purview of the legislation." The decision incorporated the findings in *Wilson v. Watt,* which stated: "The court finds that Congress did not express its intent as to how and when these funds [the $4 million Alaska Native general assistance appropriation] should be spent in the appropriations bill, Public Law 97–100, 95 Stat. 1399."

The Appropriation Act, however, expressly states:

"[T]he funds made available to tribes and tribal organizations through contracts authorized by the Indian Self-Determination and Education Assistance Act of 1975 (88 Stat. 2203; 25 U.S.C. § 450 et seq.) shall remain available until September 30, 1983: *Provided,* That this carryover authority does not extend to programs directly operated by the Bureau of Indian Affairs. . . ."

Act of December 23, 1981, Pub.L. 97–100, 95 Stat. 1399.[8]

The district court misunderstood the nature of the contract claims and misinterpreted the Appropriations Act. In view of the statutes and regulations providing for contracts pursuant to the Indian Self-Determination Act, the policy statements of Congress regarding these contracts,[9] and the plain wording of the Appropriations Act, AVCP has demonstrated a fair chance of success on whether Congress preserved funds for the AVCP–BIA contracts through September 30, 1983. As the Supreme Court has recently reminded us, "[I]n determining the scope of a statute, one is to look first at its language. *Lewis v. United States,* 445 U.S. [55] at 60 [100 S.Ct. 915, 918, 63 L.Ed.2d 198]; *United States v. Turkette,* 452 U.S. 576, 580 [101 S.Ct. 2524, 2527, 69 L.Ed.2d 246] (1981)." *Dickerson v. New Banner Institute,* —— U.S. ——, ——, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983). To determine this claim, the plain language is quite adequate.

B. *Individuals' Claims: Congressional Intent to Terminate*

Appellants contend Congress intended to terminate general assistance in Alaska only

---

**8.** The "carryover authority" refers to authority to continue expenditure of funds beyond the 1982 fiscal year covered by the Act. 25 U.S.C. § 13a (1976), a part of the Indian Self-Determination and Education Assistance Act, *see supra* note 7, states:

Carryover of unobligated and unexpended appropriations.

The provisions of any other laws to the contrary notwithstanding, any funds appropriated pursuant to sections 13 and 52a of this title [Snyder Act], for any fiscal year which are not obligated and expended prior to the beginning of the fiscal year succeeding the fiscal year for which such funds were appropriated shall remain available for obligation and expenditure during the succeeding fiscal year.

Act of January 4, 1975, Pub.L. No. 93–638, § 8, 88 Stat. 2206.

The legislative history to section 13a is in accord. *See* H.R.Rep. No. 1600, 93rd Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 7775, 7776.

**9.** *See* 25 U.S.C. §§ 450(a), 450a(a) (1976); 25 C.F.R. § 271.4 (1982).

if the State of Alaska had implemented a comparable program. Appellants base this claim on BIA regulations,[10] and on committee reports to the appropriations process indicating Alaska was implementing a comparable program and that Alaska Natives would not be without aid during the transition.

The district court concluded there was "no contrary legislative history concerning the $4 million dollar appropriation, and therefore Congress' intent is embodied in the report of the joint conference committee." The district court also concluded: "The House and Senate Joint Conference Committee report specifying the six-month limit is controlling because it expresses the precise intent of Congress and because no contrary legislative history exists."

The Conference Committee Report upon which the district court relied, H.R.Rep. No. 315, 97th Cong., 1st Sess. 17 (1981) states in pertinent part:

> The managers also agree that the $4,000,-000 increase in the social services program is to provide for general assistance payments for Alaska natives for a six-month period. This will allow time for the Alaska State legislature to appropriate state funds to provide these payments from that time on. If the Bureau finds that $4,000,000 is not sufficient to provide the level of payments to eligible Alaska natives during this six-month period as required based on need, the managers agree that such payments may be made from the remainder of the Bureau's social services program until state funds become available, but not beyond April 1, 1982.

From this report alone, the district court concluded that Congress had unconditionally terminated the general assistance program to Alaska Natives and that no appro-

priated funds, or any other funds, could be spent by BIA after April 1, 1982.

28 U.S.C. § 13a (1976), *see supra* note 8, provides that unexpended Snyder Act appropriations shall remain available for expenditure in the succeeding fiscal year, notwithstanding any other law to the contrary. The district court's conclusion that appropriated funds could not be spent after April 1, 1982 was erroneous.

Other committee reports and hearings before appropriation committees contain legislative history contrary to the district court's conclusion. The House Report accompanying the Appropriations Act states:

> The recommended level of $90,104,000 for social services includes the Bureau's proposed reduction of $5.7 million, to discontinue the general assistance program for Alaska Natives in the State of Alaska. In addition, the Committee has included a further reduction of $300,000 for administrative costs related to the Alaska general assistance program. The Committee is pleased that the State of Alaska has recognized its responsibility to include Alaska Natives under its general assistance program, and has every expectation that the Alaska legislature will act expeditiously to appropriate the necessary funds before October 1, 1981....

H.R.Rep. No. 163, 97th Cong., 1st Sess. 38–39 (1981).

The Senate Report accompanying the Appropriations Act states:

> The Committee has increased the allowance for social services by $5,700,000 to partially meet the costs of welfare assistance in Alaska. The Committee does not disagree with the premise that the State should assume these costs, but a phase out of Bureau support is required to ensure an orderly transition. The latest available figures indicate that the Bu-

---

**10.** Section 20.3 provides:

Policy.

When assistance or services are not available or not being provided by state, local, or other agencies, general assistance, child welfare assistance, miscellaneous assistance and family and community services *shall be provided* for eligible Indians by the Bureau in a

manner designed to promote personal and family unity and economic and social stability, working toward attainment of self-sufficiency.

25 C.F.R. § 20.3 (1982) (emphasis added). *See also* 25 C.F.R. § 20.21(b), (c) (1982) (set out in full at note 2 *supra*).

reau will spend almost $10,000,000 in fiscal year 1981 on welfare grants in Alaska. The Committee fully intends that the State absorb any fiscal year 1982 costs in excess of the $5,700,000 which has been provided.

S.Rep. No. 166, 97th Cong., 1st Sess. 39 (1981).

Other reports indicate that congressional members anticipated a transition period during which the State of Alaska would implement a comparable general assistance program.[11] There were representations by the Department of Interior officials during debate that Alaska would implement a comparable program.[12] It is undisputed that Alaska did not have a comparable general assistance program as prescribed in 28 C.F.R. § 20.21(c), and was not ready to implement one at the time of the termination.[13]

Taken together these reports indicate legislative history contrary to the purported meaning of the Joint Conference Committee Report. The district court's conclusion that no contrary legislative history existed was clearly erroneous.

Based on its interpretation of the Appropriations Act and the legislative history, the district court concluded that the Alaska Na-

tives had little possibility of success on the merits. We conclude that the legislative history as a whole indicates Alaska Natives have a fair chance of success on the question of whether Congress intended to terminate the general assistance program only if Alaska had a comparable program.[14]

■ The Snyder Act general assistance program is for the special benefit of Indians and must be liberally construed in their favor. *Rincon Band of Mission Indians v. Harris,* 618 F.2d 569, 573 (9th Cir.1980) (rejecting ratification by appropriation of challenged regulations implementing Snyder Act); *Fox v. Morton,* 505 F.2d 254, 255 (9th Cir.1974) (due process hearing required before termination of Snyder Act program). *See also Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) (construing Snyder Act); *Vigil v. Andrus,* 667 F.2d 931, 934 (10th Cir.1982) (Snyder Act program).

The government contends Congress intended to terminate Snyder Act general assistance in Alaska even if Alaska had no comparable program as prescribed by BIA regulations. The government has not made an adequate showing of such congressional knowledge. *See Rincon Band,* 618 F.2d at 573.[15] Indeed, the legislative history indicates congressional members thought a

---

**11.** *See Department of the Interior and Related Agencies Appropriations Fiscal Year 1982: Hearings on H.R. 4035 Before the Senate Committee on Appropriations,* 97th Cong., 1st Sess. 607–08 (1981).

**12.** *Department of Interior and Related Agencies Appropriations for 1982, Hearings Before a Subcomm. of the House Comm. on Appropriations,* 97th Cong., 1st Sess. 1261–62 (1981). *See also Senate Select Committee on Indian Affairs, Analysis of the Budget Pertaining to Indian Affairs Fiscal Year 1982,* 97th Cong., 1st Sess. 7 (Comm. Print 1981).

**13.** Letter from Jay Hammond, Governor of Alaska, to James G. Watt, Secretary of the Interior (Nov. 25, 1981) (describing state's inability to assume the general assistance program); letter from State of Alaska, Department of Health and Social Services, Helen D. Beirne, Commissioner, to BIA General Assistance Household (Mar. 24, 1982) (describing state's limited general relief assistance program); Impact Analysis Statement, *supra* notes 3–4.

**14.** Principles for interpreting congressional intent from appropriations acts and committee reports are well established. *See, e.g., Tennessee Valley Authority v. Hill,* 437 U.S. 153, 188–90, 98 S.Ct. 2279, 2298–99, 57 L.Ed.2d 117 (1978) (rejecting repeal by appropriation; Appropriation Act and Committee reports not clear indications of congressional intent); *Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 23–24, 96 S.Ct. 1938, 1948, 48 L.Ed.2d 434 (1975) (careful examination of *all* legislative history to determine congressional intent). *See also Libby Rod & Gun Club v. Poteat,* 594 F.2d 742, 746 (9th Cir.1979) ("[W]e are hesitant . . . to interpret isolated remarks in committee hearings or reports as expressions of the intent or knowledge of Congress."). *Accord, Associated Electric Cooperative, Inc. v. Morton,* 507 F.2d 1167, 1174–75 (D.C.Cir.1974).

**15.** The principles enunciated by the Supreme Court in *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), and applied by this court in *Rincon Band* apply to assessment of the merits of the Alaska Natives' claims. In *Rincon Band* we

comparable program was implemented in Alaska, or if it was not, that an orderly transition would be provided.

The district court relied on an erroneous understanding of the applicable principles of interpreting congressional intent. The error substantially affected its determination that the plaintiffs had no chance of success on the merits. Alaska Natives demonstrated a fair chance of success on the question whether Congress intended to unconditionally terminate general assistance to Alaska.[16]

### CONCLUSION

The balance of hardships tips sharply in favor of the Alaska Natives. The district court erred in its assessment of the merits of the Alaska Natives' claims. The individual class recipients showed merit to their claim that Congress intended to terminate the program only if Alaska had a comparable general assistance program. AVCP demonstrated at least a fair chance of succeeding on the question whether the Appropriations Act preserved funds for the Indian Self-Determination Act contracts. Carryover of unexpended Snyder Act appropriations is required by 25 U.S.C. § 13a (1976).

Accordingly, denial of the preliminary injunction is reversed and the case remanded for entry of preliminary relief. The district court shall order the reinstatement of the Alaska Native general assistance program until trial on the merits to the extent of the $1.7 million which remained available at the time of its decision denying preliminary relief. *See Connecticut v. Schweiker,* 684 F.2d 979, 999 (D.C.Cir.1982), *cert. denied, sub nom. Schweiker v. Con-*

*necticut,* —— U.S. ——, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983). The district court shall order that such funds be held available as is necessary to implement its order. *See Jacksonville Port Authority v. Adams,* 556 F.2d 52, 56 (D.C.Cir.1977); *National Association of Neighborhood Health Centers v. Mathews,* 551 F.2d 321, 339 (D.C.Cir.1976). In deciding whether such relief is appropriate, we have considered the relevant factors as discussed in *Jacksonville* and *Connecticut. See Connecticut,* 684 F.2d at 998. Injunctive relief is not barred in this case even at this late date. As the *Jacksonville* court stated, 28 U.S.C. § 2106 "permits the provision of the relief even at this late date that would have been available on the merits from the court if it had done what should have been done and provided a preservation remedy." 556 F.2d at 57.

Reversed and remanded.

were concerned with ratification by appropriation of a challenged policy of the Indian Health Service in administering Snyder Act funds to California Indians. There we stated: "Ratification by appropriation will not be found unless the government has sustained 'the heavy burden of demonstrating congressional knowledge of the precise course of action alleged to have been acquiesced in.'" *Rincon Band,* 618 F.2d at 573 (citations omitted). "Moreover, the appropriations 'must plainly show a purpose to bestow the precise authority which is claimed.'" *Id.* (citations omitted.) The principles applicable to ratification by appropriation

are analogous to those applicable to repeal by appropriation, enunciated by the Supreme Court in *Tennessee Valley Authority v. Hill. Id.* at 574 n. 6.

**16.** Appellants also argued that BIA's termination of the general assistance program violated various provisions of the Administrative Procedure Act, 5 U.S.C. §§ 552, 553. Since we find other claims of appellants sufficient to warrant a preliminary injunction, we need not decide these issues. *Aleknagik Natives Ltd. v. Andrus,* 648 F.2d 496, 504 (9th Cir.1980).