**RINCON BAND OF MISSION INDIANS et al., Plaintiffs,**

v.

**Joseph A. CALIFANO, Jr., et al., Defendants.**

**The PEOPLE OF the STATE OF CALIFORNIA ex rel. Obledo, et al., Plaintiffs in Intervention,**

v.

**Joseph A. CALIFANO, Jr., et al., Defendants.**

**No. C–74–0959.**

United States District Court, N. D. California.

Feb. 14, 1979.

Barbara E. Karshmer, Art Bunce, George Forman, Bruce Friedman, California Indian Legal Services, Escondido, Cal., for plaintiffs.

Evelle J. Younger, Atty. Gen., Thomas E. Warriner, Richard M. Skinner, Deputy Attys. Gen., Sacramento, Cal., for plaintiffs in intervention state of California.

G. William Hunter, U. S. Atty., David E. Golay, Asst. U. S. Atty., San Francisco, Cal., for defendants.

## AMENDED MEMORANDUM OF OPINION

RENFREW, District Judge.

This is a class action brought by certain Native American Indians residing in the State of California who seek to challenge defendants' allegedly discriminatory and illegal distribution of federal funds for Indian health services.[1] Plaintiffs contend that the Department of Health, Education, and Welfare (HEW) and the Indian Health Service (IHS) have, for no rational reason, denied Indians living within California their fair share of federal funds allocated pursuant to the Snyder Act, 25 U.S.C. § 13.[2] The action is now before this Court on cross motions for summary judgment. Plaintiffs in intervention have filed a motion in support of summary judgment for plaintiffs.

## BACKGROUND

On September 16, 1976, this Court denied plaintiffs' and defendants' motions for summary judgment because they had not explored in depth the reasons why the IHS

---

1. By this opinion this Court certifies plaintiffs' class consisting of those who:

   (1) are persons of Indian descent residing in the State of California; and

   (2) are eligible to receive direct and/or contract health care services from the Indian Health Service pursuant to Indian Health Service eligibility guidelines; and

   (3) have been in need of health care services at any time since approximately 1968 when federal termination policies were repudiated, or who are presently in need of health care services, or who can reasonably be expected to be in need of health care services at a future time; and

   (4) are being denied direct and/or contract health care services in California because of defendants' discriminatory and illegal distribution of federal funds for Indian health care services.

2. The Snyder Act is a general enabling statute allowing the Bureau of Indian Affairs to "direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States * * *."

funds are allocated in the manner they are. Defendants subsequently provided plaintiffs with voluminous data on this issue in response to the latter's discovery requests. Summarized, the data shows the following conspicuous pattern of disproportionate funding in California:

1. The IHS informed Congress during fiscal year 1977 budget hearings that its national service population totaled 518,000. Of this number, approximately 52,000, or 10%, resided on or near reservations in California.

2. Since 1956 the IHS has allocated to California no more than 1.93% of its total funds in any one year, with the average being only 1.18% over the past five years.

3. Of the 8100 professional IHS health care personnel in the United States, only 45, or less than .60%, are assigned to California.

4. Although IHS operates 51 hospitals, 99 health centers, and several hundred health stations in the United States, California Indians are served by only one hospital and two health centers located within the state.

5. Only .35% of the total IHS funds for health facilities allocated over the next seven years is to be spent in California.

Plaintiffs argue that this evidence shows not only that defendants have failed in their responsibility to provide adequate health care services to California Indians, but also that they have arbitrarily allocated IHS funds in such a way as to deprive California Indians of health care services comparable to those provided Indians living in other parts of the country. In response, defendants assert that their allocation scheme is rationally based and mandated by Congress. After considering both parties' arguments, the Court concludes that defendants' explanations for the disproportionate allocation of program resources fail to establish any rational basis for the challenged process of allocation.

## CONGRESSIONAL RATIFICATION

Defendants' primary argument is that Congress has implicitly ratified their system of allocation. They contend that Congress's limited response to repeated requests for substantial increases in funding for the California Rural Indian Health Board (CRIHB), made during the appropriations process, was reasonably interpreted by IHS officials as approval of the scope of the IHS program for Indians in California. Thus, according to defendants, Congress has approved the IHS policy of limiting services in California to those services provided by CRIHB. This argument is without merit.

Numerous groups petition Congress every year for additional funds for their special projects. The Appropriations Committee funds only a fraction of those requests. The refusal to comply with every funding request does not mean, however, that Congress has decided that those projects not specifically funded, or those receiving only limited funding, are precluded from obtaining additional funds from other federal sources; nor does it mean that people serviced by specially funded projects must be ignored by other federal programs that provide comparable services. If defendants' argument were accepted, federal agencies would be prohibited from providing services to any person residing in an area supposedly served by a "Congressionally mandated" program. In the instant case, because "Congressional mandates" account for less than 5% of IHS budget for services, this would mean that California Indians would not be eligible to receive services financed by 95% of the IHS budget simply because CRIHB received a fraction of the 5% of the funds specially allocated by Congress. Obviously this cannot be so.

Defendants' ratification argument is further weakened by Congressional rules that forbid the use of appropriation acts to legislate. L. Deschler, *Manual and Rules of the House,* H.R.Doc.No.439, 91st Cong., 2d Sess. (1971), at 476 ¶ 2. *See also City of Los Angeles v. Adams,* 181 U.S.App.D.C. 163, 171–72, 556 F.2d 40, 48–49 (1977); *Environmental Defense Fund v. Froehlke,* 473 F.2d 346, 354 (8 Cir. 1972); *Associated Electric Cooperative, Inc. v. Morton,* 165 U.S.App. D.C. 344, 351 n. 11, 507 F.2d 1167, 1174 n.11

(1974). Courts will not find that Congress intended to ratify agency policy through an appropriation unless there is express language to that effect included in the legislation. *Ex Parte Endo,* 323 U.S. 283, 303 n.24, 65 S.Ct. 208, 89 L.Ed. 243 (1944). *See also Associated Electric Cooperative, Inc. v. Morton,* 165 U.S.App.D.C. 344, 351, 507 F.2d 1167, 1174 (1974); *Committee for Nuclear Responsibility v. Seaborg,* 149 U.S.App.D.C. 380, 382, 463 F.2d 783, 785 (1971). No such language exists in the Snyder Act. Accordingly, Congress's limited funding of CRIHB cannot be interpreted as a ratification of the IHS's minimal allocation of funds to California, and Congress's decision not to expand CRIHB in California does not eliminate the IHS's continuing obligation under the Snyder Act to distribute rationally and equitably *all* of the available program funds.

## RESOURCE ALLOCATION CRITERIA

■ The IHS distributes program funds among the nation's Indians with the aid of an apparently sophisticated decision-making index known as the Resource Allocation Criteria (RAC). This index, developed to provide a method for assessing the relative health care needs of the nation's Indians, was intended to permit defendants to measure the health care needs of California Indians and to compare them with the needs of Indians in other parts of the country. Armed with this data, defendants could presumably ensure that no Indian group received a disproportionate share of the funds unless its needs far exceeded those of other Indian groups, and that no group suffered from funding discrimination unless its health care needs were considerably less than the needs of Indians elsewhere.

If RAC were utilized as intended, and its criteria system soundly based, any disproportionate funding resulting from the comparative needs of various Indian populations would be perfectly reasonable and legitimate. The IHS contends that RAC is used as intended and that it provides the basis for the IHS's allocation of funds in California and other states. Therefore the IHS concludes that its program is not discriminatory. However, the evidence shows that RAC is, now at least, no more than a bureaucratic charade with respect to all IHS funds in general, and California Indians in particular. Moreover, defendants' reliance on their use of RAC only reinforces the Court's conclusion that the agency's allocation system is irrationally administered.

The principal deficiency with defendants' argument is that the RAC system upon which they rely is apparently utilized only with respect to the $15.25 million in Title II Indian Health Care Improvement Act funds allocated in 1978. These funds comprise less than 3% of the IHS's annual appropriation for Indian health care services.[3] (California received only 5% of the Title II funds, or $778,400.) The agency has said nothing about RAC with respect to its 1978 allocation of $6 million in Title I funds, nor of the $71.25 million in Title III funds. Furthermore, there is no indication that RAC has been applied in determining the distribution of the $428.5 million in 1978 Snyder Act funds. (California received $5,541,000, or 1.3% of these funds.) Obviously then, use of the RAC system could not rationally explain the miserly allocation of IHS Funds to California since RAC is not utilized to determine the distribution of 97% of the agency's funds.

Unfortunately, the inadequacies of the alleged RAC system do not end there. There is substantial doubt whether RAC is even being applied conscientiously to that portion of the remaining 3% of the IHS funds designated for California.

Robert McSwain, Director of the IHS California Program Office, testified during his deposition that it was both impossible and inappropriate to apply RAC to California. *See* Deposition of Robert McSwain, p. 42, lines 16–28, and p. 43, lines 1–8. Moreover, he stated that RAC is not used to

---

**3.** It appears that IHS used RAC to distribute only a small part of the $15.25 million in Title II funds. At the time the 1978 allocations were made, for example, there were no RAC for allocation of facilities, emergency medical services, or alcoholism.

measure unmet needs in California.[4] *Id.* at p. 20, lines 1–7. This is primarily because of the lack of workload and utilization data necessary to complete the RAC documents employed in determining the unmet health care needs. Essentially, he concluded that the lack of facilities and staff in California left IHS without a sufficient data base to compute the needs of California Indians.

Defendants dispute this conclusion. First, they point to their application of RAC to California in fiscal year 1977. Next, they claim that McSwain's testimony

" * * * is nothing more than an expression of his view that use of State data for the general population may not accurately reflect actual epidemiology or predict utilization patterns for the Indian service population in California. * * * Admittedly, the use of projected utilization data based on State data from another population group may not be as accurate as use of actual utilization data for the service population where such data is available. In the absence of such data for California, however, the best available data was in fact utilized." Defendants' Closing Memorandum at p. 3.

Finally, they note that Mr. Jack Casebolt, Director of the Office of Program Planning of the IHS, indicated in his affidavit, contrary to McSwain's deposition, that the lack of epidemiology data on the service population did not preclude application of RAC in California.

Despite Casebolt's opinion, defendants' admissions and McSwain's unequivocal statements cause the Court to question the validity of RAC as applied to California. A rational system needs a reasonable and reliable source of information. The conspicuous absence of the data necessary to make RAC a truly effective tool for the rational allocation of program dollars exposes the inherent weakness of defendants' allegedly rational distribution system.

Even if the Court were convinced that RAC had been effectively and rationally employed, however, it would have to contend with the fact that RAC is at most a very recent invention. It was developed by a special IHS task force, the Resource Allocation Committee, over a 4-year period, 1972–1975, and first used three years thereafter. Accordingly, defendants' reliance on RAC provides no explanation for the disproportionate allocation of IHS funds prior to 1978. Moreover, the IHS has made no at-

4. Mr. McSwain testified at his deposition as follows:

"Q [Mr. Skinner] Have resource allocation criteria been developed for California?

"A Not officially. And the reason for that is not sufficient epidemiology data.

"Q Is that the only reason?

"A That's one of the major ones. That's the major input into the resource allocation criteria is the evidence of disease indexes, morbidity, and so forth, that isn't available, hasn't been available with the programs out here.

* * * * * *

"A * * * And consequently it would make the—render the resource allocation document rather useless."

Deposition at p. 19, lines 10–25.

"Q [Ms. Karshmer] Have you attempted to compile information on what extent the [health care] needs of [California Indians] are unmet?

"A * * * [W]e did make an attempt to apply the resource allocation criteria at one point. It was a futile attempt because of the lack of workload data, lack of utilization data, We weren't able to really complete the document at all.

* * * * * *

"Q So, it was your conclusion that it was impossible to apply the resource allocation criteria to California?

"A [The witness nodded his head in the affirmative.] Because of all the assumptions we would have to make."

Deposition at p. 42, lines 10–28.

"A An example of an assumption is the workload data. We had to assume that the average patient visit per year was five. * *

"And that's an assumption we know is not valid.

Deposition at p. 51, lines 17–22.

"A The cost data. We had to assume that the cost data was constant throughout California, the cost per patient visit. The cost per hospital day, which we know varies from one end of the state to the other. * * *"

Deposition at p. 52, lines 2–5.

"Q [Mr. Skinner] What is the affect [sic] of making so many assumptions upon the usefulness of that document?

"A It's an exercise in futility is what it amounts to."

Deposition at p. 71, lines 26–28.

tempt to supply the Court with a rationale for its long history of discriminatory funding of California Indian health care programs.

## EQUAL PROTECTION

The leading case on the allocation of funds under the Snyder Act is *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). There, the Supreme Court held that the Bureau of Indian Affairs must make general assistance under the Snyder Act available to Indians living near reservations, as well as to those living on reservations. While the Court limited its holding to the narrow question before it, it outlined some general principles for the allocation of funds under the Act that are controlling here. Specifically, the Court recognized that the Secretary of the Interior has the "power to create reasonable classifications and eligibility requirements in order to allocate the limited funds available." However, it went on to caution that if there are not enough funds to serve all needy beneficiaries, then it is

> "incumbent upon the BIA to develop an eligibility standard to deal with this problem, and the standard, if rational and proper, might leave some of the class otherwise encompassed by the appropriation without benefits. But in such a case the agency must, at a minimum, let the standard be generally known so as to assure that it is being applied consistently and so as to avoid both the reality and the appearance of arbitrary denial of benefits to potential beneficiaries." 415 U.S. at 230–231, 94 S.Ct. at 1072.

▉ This same requirement applies in the instant controversy. The IHS has never promulgated separate standards for eligibility for California Indians. However, it has, without a rational basis,[5] denied the vast majority of California Indians health services comparable to those available to Indians in other parts of the country. The IHS's explanations and unsuccessful attempts to justify its history as a health care provider for California Indians are inadequate. The burden of providing a rational basis for the disproportionate funding of health care programs for Indians in California has not been met. Consequently, the Court finds that defendants' past and present allocation system for the distribution of IHS funds violates the California Indians' right to equal protection of the law as guaranteed by the due process clause of the Fifth Amendment.[6] *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). There is no rational basis to justify defendants' long history of minimal funding of California Indian health service programs.

Accordingly, IT IS HEREBY ORDERED that plaintiffs' motion for class certification is granted.

IT IS HEREBY FURTHERED ORDERED that plaintiffs' and plaintiffs-in-intervention's motions for summary judgment are granted.

IT IS HEREBY FURTHER ORDERED that defendants' motion for summary judgment is denied.

IT IS HEREBY FURTHER ORDERED that counsel for plaintiffs shall prepare an appropriate form of judgment in accord-

---

5. Plaintiffs and defendants dispute the standard under which defendants' conduct should be analyzed. Plaintiffs argue that the "strict scrutiny" tests of *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), and *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), are applicable because fundamental rights of access to health care and to interstate travel are at issue herein. Defendants, on the other hand, contend that the "rational basis" test is applicable under the ruling of *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Because the

Court finds that defendants' conduct lacks even a rational basis, it need not decide whether the "strict scrutiny" standard is appropriate.

6. The benefits at issue here, health care services, are sufficiently similar to welfare benefits, *see Memorial Hospital v. Maricopa County,* 415 U.S. 250, 259–260, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), to qualify as an "entitlement" to a constitutionally protected "property interest" as required under *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

ance with this Memorandum of Opinion, obtain approval as to form of judgment from counsel for plaintiffs-in-intervention and counsel for defendants, and submit it to the Court for execution within fifteen (15) days of the date of this order.