**RINCON BAND OF MISSION INDIANS, et al., Plaintiffs-Appellees,**

v.

**Patricia HARRIS, Secretary of Health, Education and Welfare, et al., Defendants-Appellants.**

**The PEOPLE OF the STATE OF CALIFORNIA ex rel. Obledo, et al., Plaintiffs in Intervention-Appellees,**

v.

**Patricia HARRIS, Secretary of Health, Education and Welfare, et al., Defendants-Appellants.**

**No. 79–4256.**

United States Court of Appeals, Ninth Circuit.

May 8, 1980.

G. William Hunter, U. S. Atty., David E. Golay, Asst. U. S. Atty., San Francisco, Cal., Nancy B. Firestone, Washington, D. C., for defendants-appellants.

Barbara E. Karshmer, Escandido, Cal., for plaintiffs-appellees.

John J. Klee, Jr., Deputy Atty. Gen., San Francisco, Cal., for plaintiff in intervention.

Before TANG and FERGUSON, Circuit Judges, and CURTIS,[*] District Judge.

FERGUSON, Circuit Judge:

This case presents the question of whether the distribution of federal funds by the Indian Health Service ("IHS") to California Indians violates the IHS's statutory, trust or constitutional duties. The district court granted the plaintiff-Indians' motion for summary judgment, declaring that the IHS's system for the allocation of its funds violated the California Indians' constitutional right to equal protection. *Rincon Band of Mission Indians v. Califano*, 464 F.Supp. 934 (N.D.Cal.1979). In a subsequent clarification of that judgment, the district court declared that, "[i]n accordance with this conclusion, defendants are obligated to adopt a program for providing health services to Indians in California which is comparable to those offered Indians elsewhere in the United States." We affirm the district court's granting of summary judgment for plaintiffs. Because we have concluded that the IHS breached its statutory responsibilities to the California Indians, we do not reach either the trust or constitutional questions.

## I. FACTS

The IHS provides medical and hospital care and a full range of public health services for Indians throughout the United States. Funds for the IHS are authorized under the Snyder Act, 25 U.S.C. § 13 (1921) and the Indian Health Care Improvement Act, 25 U.S.C. § 1601 *et seq.* (1976) ("IHCIA"). The Snyder Act is a general enabling statute authorizing the Bureau of Indian Affairs ("BIA")[1] to "direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States . . ." for a variety of enumerated purposes.[2] The IHCIA was passed after the commencement of this action in order to supplement the existing IHS budget.

California Indians were severed from the IHS program in the early 1950's at the request of the State of California as part of a formal policy of ending the trust status of the Indians. They received no further federal health services funds until 1967 when the State of California and the federal Public Health Service funded an outreach program for rural Indians. The California Rural Indian Health Board ("CRIHB"), a pri-

---

[*] Honorable Jesse W. Curtis, Senior United States District Judge, Central District of California, sitting by designation.

1. The administration of the Snyder Act was transferred from the BIA to the Surgeon General in 1954, and from the Surgeon General to the Department of Health, Education and Welfare in 1966.

2. The Snyder Act provides as follows:

The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes:

General support and civilization, including education.

For relief of distress and conservation of health.

For industrial assistance and advancement and general administration of Indian property.

For extension, improvement, operation, and maintenance of existing Indian irrigation systems and for development of water supplies.

For the enlargement, extension, improvement, and repair of the buildings and grounds of existing plants and projects.

For the employment of inspectors, supervisors, superintendents, clerks, field matrons, farmers, physicians, Indian police, Indian judges, and other employees.

For the suppression of traffic in intoxicating liquor and deleterious drugs.

For the purchase of horse-drawn and motor-propelled passenger-carrying vehicles for official use.

And for general and incidental expenses in connection with the administration of Indian affairs.

vate organization, administered that program under a contract with the State of California. Congress formally reinstated the California Indians into the IHS program at the request of the California State Assembly with an appropriation for CRIHB in fiscal year 1971.

Once Snyder Act funds have been appropriated by Congress, the IHS allocates those funds according to the following priority system: (1) program continuity, (2) mandatory costs, (3) congressional mandates, and (4) program expansion. This system is an administrative creation of the IHS, and is not required by statute.[3] Program continuity funds, which constituted an average of 85 per cent of the health services portion of the IHS budget from 1970 to 1978, are allocated so as to provide each existing program with the same amount of money it received the previous year. Mandatory costs, which comprised an average of approximately 8 per cent of the services budget from 1970 to 1978, include items such as Civil Service pay increases and inflationary cost index increases. These costs are directly tied to the program continuity budget. Congressional mandates, which accounted for an average of 2 per cent of the services and 25 per cent of the facilities budget from 1970 to 1978, are the funds specifically earmarked by Congress for particular facilities and programs. Program expansion funds, which comprised approximately 5 per cent of the services budget and approximately 75 per cent of the facilities budget from 1970 to 1978, are those funds which remain after allocations have been made to the first three priority categories. The IHS appears to have a significant amount of discretion with respect to the allocation of program expansion funds.

IHCIA funds, which are considered program expansion funds, are allocated to specific programs authorized by the statute, to health facilities earmarked on a project-to-project basis by Congress, and to individuals and groups meeting the statutory standards

for health recruitment and urban health programs. Any remaining funds are used for health services and are distributed on the basis of the Resource Allocation Criteria ("RAC"). The RAC is a decision-making index developed to provide a method for assessing the relative health care needs of the nation's Indians.

Under the IHS priority system, California Indian health services are funded initially through congressional mandates for CRIHB. In succeeding years existing programs receive program continuity funds while new programs are funded through congressional mandates. California Indians received none of the program expansion money allocated by the IHS between 1968 and 1977. Using the figures most favorable to the government, California Indians have received 7 per cent of IHCIA services funds since 1978.

The district court made the following findings of fact:

1. The IHS informed Congress during fiscal year 1977 budget hearings that its national service population totaled 518,-000. Of this number, approximately 52,-000, or 10%, resided on or near reservations in California.

2. Since 1956 the IHS has allocated to California no more than 1.93% of its total funds in any one year, with the average being only 1.18% over the past five years.

3. Of the 8100 professional IHS health care personnel in the United States, only 45, or less than .60%, are assigned to California.

4. Although IHS operates 51 hospitals, 99 health centers, and several hundred health stations in the United States, California Indians are served by only one hospital and two health centers located within the state.

5. Only .35% of the total IHS funds for health facilities allocated over the next seven years is to be spent in California.

---

**3.** The annual budget submitted by the IHS to Congress is divided into two broad components: health services and health care facilities. It is not broken down according to the IHS's four-part priority system.

## II. *SNYDER ACT*

The explicit language of the Snyder Act contains no provisions regarding eligibility criteria or distribution guidelines for any program. The Supreme Court, however, outlined the general principles for the allocation of funds under the Snyder Act in *Morton v. Ruiz*, 415 U.S. 199, 230–31, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974):

> Having found that the congressional appropriation was intended to cover welfare services at least to those Indians residing "on or near" the reservation, it does not necessarily follow that the Secretary is without power to create reasonable classifications and eligibility requirements in order to allocate the limited funds available to him for this purpose. Thus, if there were only enough funds appropriated to provide meaningfully for 10,000 needy Indian beneficiaries and the entire class of eligible beneficiaries numbered 20,000, it would be incumbent upon the BIA to develop an eligibility standard to deal with this problem, and the standard, if rational and proper, might leave some of the class otherwise encompassed by the appropriation without benefits. But in such a case the agency must, at a minimum, let the standard be generally known so as to assure that it is being applied consistently and so as to avoid both the reality and the appearance of arbitrary denial of benefits to potential beneficiaries.

*Id.* at 230–31, 94 S.Ct. at 1072 (citations omitted).

The IHS has expressly stated that it is unable to reach all eligible beneficiaries of its health services with the funds currently appropriated for it by Congress. *Ruiz* therefore requires that the IHS establish and consistently apply a reasonable standard for the allocation of its limited health services and facilities budget. While *Ruiz* does not explicitly state that the standard must be rational or result in an equitable distribution, it stresses that the purpose of establishing a clear standard is to prevent arbitrary denials of benefits. We can infer from this that the Court in *Ruiz* intended that the administering agency develop criteria for distribution that are rationally aimed at an equitable division of its funds.

This conclusion is consistent with the prior law of this circuit. *See Fox v. Morton*, 505 F.2d 254 (9th Cir. 1974). In *Fox*, this court held that the Indian plaintiffs were entitled to a due process hearing prior to termination from a program funded under the Snyder Act. We stated as follows:

> At the outset, we recognize that assistance programs established under the Snyder Act are for the special benefit of Indians and Indian communities and must be liberally construed in their favor. *Ruiz stands for the principle that our government has an overriding duty of fairness when dealing with Indians*, one founded upon a relationship of trust for the benefits of these ". . . dependent and sometimes exploited people." *The Snyder Act was enacted with this principle in mind, and its programs must be administered accordingly.*

*Id.* at 255 (citations omitted) (emphasis added).

The obligations imposed on the IHS by the Snyder Act are not satisfied by either the Resource Allocation Criteria or the IHS's internal priority system. The trial court determined that the criteria were "no more than a bureaucratic charade with respect to all IHS funds in general, and California Indians in particular . . .," adding that "defendants' reliance on their use of RAC only reinforces the Court's conclusion that the agency's allocation system is irrationally administered." The overriding factor in the trial court's conclusion that the RAC does not facilitate a rational distribution of IHS funds to California was the absence of the data necessary to compute the unmet needs of California Indians. Obviously, the RAC cannot effectively assess unmet needs of California Indians without the workload and actual utilization data that is necessary to complete the RAC documents used to determine those needs. A distribution to California Indians on the basis of a comparison of the RAC figures for all eligible beneficiaries cannot be ra-

tional where it is impossible using RAC to assess accurately the unmet needs of the California Indians.

The internal priority system devised by IHS also fails to provide a system of allocation that is rationally aimed at an equitable distribution of funds. As noted above, 85 per cent of the health services budget appropriated by Congress is allocated by IHS under program continuity to existing programs. The record indicates that Congress automatically re-funds these programs without regard to whether they are in fact meeting the health care needs of their service populations. A system that allocates funds to programs merely because the programs received funds the previous year, regardless of whether the programs are ineffective, unnecessary or obsolete is not rationally aimed at an equitable division of funds.

We are persuaded that the district court was correct in stating that the IHS has a "continuing obligation under the Snyder Act to distribute rationally and equitably *all* of the available Program funds." *Rincon Mission Band of Indians v. Califano, supra*, 464 F.Supp. at 937 (emphasis in original). The IHS has breached this statutory duty to the California Indians by failing to allocate its limited funds in accordance with a rational distribution standard.[4]

III. *CONGRESSIONAL RATIFICATION*

The government argues that Congress has ratified the IHS allocation policy and that it is therefore immune from attack. The government's argument is premised on Congress's failure to fully comply with the requests of both the IHS and various senators for additional funding for California Indians, despite Congress's knowledge that funding to California is disproportionate and inadequate. The mere appropriation of funds, however, does not constitute congressional ratification of either IHS's total budgetary allocation to California Indians or its internal priority system.

Ratification by appropriation will not be found unless the government has sustained "the heavy burden of demonstrating congressional knowledge of the precise course of action alleged to have been acquiesced in." *City of Santa Clara v. Andrus*, 572 F.2d 660, 672 (9th Cir.), *cert. denied sub nom. Pacific Gas & Electric Co. v. Santa Clara*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). *Accord, Arizona Power Pooling Ass'n v. Morton*, 527 F.2d 721 (9th Cir. 1975), *cert. denied sub nom. Arizona Public Service Co. v. Arizona Power Pooling Ass'n*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); *Associated Electric Cooperative, Inc. v. Morton*, 507 F.2d 1167 (D.C. Cir. 1974), *cert. denied*, 423 U.S. 830, 96 S.Ct. 49, 46 L.Ed.2d 47 (1975). Moreover, the appropriation "must plainly show a purpose to bestow the precise authority which is claimed." *Ex Parte Endo*, 323 U.S. 283, 303 n.24, 65 S.Ct. 208, 219, 89 L.Ed. 243 (1944). *Cf. Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (absent both congressional awareness of construction of the Endangered Species Act which would effectively repeal it with respect to Tellico Dam and explicit language removing dam from scope of statute, appropriation of funds for dam did not constitute implied repeal of the statute); *Sierra Club v. Andrus*, 610 F.2d 581 (9th Cir. 1979) (appropriations act constituted authorization for pumping plant as Congress had knowledge of the precise project at issue and was explicitly and specifically addressing that project); *Libby Rod and Gun Club v. Poteat*, 594 F.2d 742 (9th Cir. 1979) (appropriations act did not confer statutorily required authorization for construction of dam as there was no evidence that Congress had affirmatively addressed itself to the issue of authorization or was even aware of it).

The government here has demonstrated nothing more than that the House and Sen-

---

**4.** In reaching this conclusion, we are not suggesting that the Snyder Act requires the IHS to allocate a per capita proportionate share of its funds to California Indians. The fact that 10 per cent of the IHS's national service population resides on or near reservations in California is significant, but it is only one of several significant factors which must be assessed in formulating a services and facilities program for the California Indians.

ate Appropriations Committees have been informed that the IHS budgetary allocation to California Indians is both inadequate and disproportionately low relative to other beneficiary groups. If Congress had expressly intended to limit the California Indians' share of IHS funds to specific congressional mandates, any failure by Congress to provide requested funds would arguably reflect Congress's position on the appropriate scope of the IHS allocation to California Indians. The government, however, has failed to show that Congress either intended its specific appropriations for CRIHB to preclude California Indians from receiving other IHS funds, or was aware of any IHS policy to that effect.[5]

The government also suggests that Congress is aware that IHS's pre-existing obligations under the program continuity policy make it impossible for the IHS to allocate additional funding to California Indians without specific increases in the congressional mandates for CRIHB. In light of Congress's alleged knowledge of the program continuity policy, the government contends that Congress's failure to comply with requests for additional funds evidences Congress's ratification of the existing IHS allocation policy. The government, however, has not demonstrated that Congress has considered, or is even aware, of the IHS's internal priority system for the distribution of funds.[6] The government has therefore failed to sustain the burden of demonstrating "congressional knowledge of the precise course of action alleged to have been acquiesced in."[7]

**5.** As the district court noted, the Appropriations Committees' refusal to comply with a particular funding request does not mean that programs that are not funded or that receive only limited funding are precluded from receiving other federal funds. If this were so, few groups would appeal to Congress for mandated funding as such an appeal would jeopardize their funding from the unmandated remainder of the IHS budget. In fact, in 1979 alone, approximately 80 Indian groups appeared before appropriations subcommittees to request additional funds.

**6.** The significance of the Appropriations Committees' failure to consider the challenged allocation policies is apparent in light of *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). That case involved the question of whether Congress's continuing appropriations for the Tellico Dam, even after its construction had been determined to be in violation of the Endangered Species Act of 1973, constituted a repeal of that Act with respect to the dam. The record showed that both the House and Senate Appropriations Committees expressly stated that, in their view, the Act either did not apply to the dam or that the dam should be completed regardless of the Act. Nevertheless, the Court refused to presume that Congress as a whole was aware of such a construction of the Act and held that continued appropriations for the dam did not, therefore, constitute repeal of the Act.

While *TVA v. Hill* involved the issue of repeal by appropriation and not ratification by appropriation, these issues are sufficiently analogous to make the Court's conclusion with regard to the significance of Appropriations Committees' actions applicable here. We therefore conclude that if the appropriations in *TVA v. Hill*

did not constitute repeal of the Endangered Species Act despite express statements to that effect by the Appropriations Committees, the appropriations in the instant case cannot be said to constitute ratification of IHS allocation policies that were never expressly considered by the Appropriations Committees. *See also Libby Rod and Gun Club v. Poteat, supra*, 594 F.2d at 746 n.6 (reasoning of *TVA v. Hill* is applicable to issue of whether Congress impliedly authorized the construction of a dam by appropriating funds for that purpose).

**7.** The government also argues that "where Congress is aware of an agency's actions and it repeatedly makes appropriations consistent with the agency's program, courts have held that such Congressional action constitutes a ratification of the agency's program." Even if the government's argument were correct, it would fail here because the government has not shown congressional awareness of the IHS allocation policies at issue.

We note also that the government's reliance on *United States v. Kennedy*, 278 F.2d 121 (9th Cir. 1960) and *United States ex rel. T.V.A. v. Two Tracts of Land*, 456 F.2d 264 (6th Cir.), *cert. denied*, 409 U.S. 887, 93 S.Ct. 109, 34 L.Ed.2d 143 (1972), is misplaced. These cases involve the limited issue of land condemnation. They hold that where Congress has given an agency broad authorization to acquire land for public uses, continued appropriations for that purpose, in light of an administrative policy of acquiring particular real estate without further authorization, constitute ratification of that policy. We recently noted our hesitance to apply these cases outside land condemnation situations. *Libby Rod and Gun Club v. Poteat, supra*, 594 F.2d at 746 n.5. The Supreme

## IV. CONCLUSION

In affirming the district court's grant of summary judgment for plaintiffs, we recognize that the relief granted is declaratory only, and that the obligation imposed on the defendants to adopt a health services program for the California Indians that is comparable to that offered Indians elsewhere is not as explicit as it might be. If further relief becomes necessary at a later point, however, both the inherent power of the court to give effect to its own judgment, *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), and the Declaratory Judgment Act, 28 U.S.C. § 2202 (1948), would empower the district court to grant supplemental relief, including injunctive relief. *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *McCann v. Kerner*, 436 F.2d 1342 (7th Cir. 1971); *Edward B. Marks Music Corp. v. Charles K. Harris Music Publishing Co.*, 255 F.2d 518 (2d Cir.), *cert. denied*, 358 U.S. 831, 79 S.Ct. 51, 3 L.Ed.2d 69 (1958); 10 Wright & Miller, Federal Practice & Procedure, § 2771 at 865–67.

Because the IHS breached its statutory duty [8] to the California Indians under the Snyder Act to develop distribution criteria that are rationally aimed at an equitable division of its funds, and in the absence of any material issues of disputed fact, the district court's grant of summary judgment is

### AFFIRMED.

Court's decision in *TVA v. Hill*, as well as our decisions in *Libby, Sierra Club v. Andrus*, 610 F.2d 581 (9th Cir. 1979), and *City of Santa Clara v. Andrus*, 572 F.2d 660 (9th Cir.), *cert. denied,.439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978), confirm our determination that the ratification language in the land condemnation cases is not applicable outside that context.

8. Plaintiff-Indians contend that the Synder Act and IHCIA create a trust obligation between the United States and the Indians, and that the IHS breached its fiduciary duty as trustee by failing to provide California Indians with a level of health services comparable to that provided Indians elsewhere in the United States. The Supreme Court recently dealt with the issue of the nature of the government's duties as trustee for the Indians in *United States v. Mitchell*, —— U.S. ——, 100 S.Ct. 1349, 63 L.Ed.2d —— (1980). The Court held in that case that the

General Allotment Act, 25 U.S.C. §§ 331–358, by which the government retains land in trust for the benefit of individual Indian allottees, does not impose a fiduciary duty on the United States to manage timber resources on trust land. *United States v. Mitchell* is inapplicable to the case before us because we do not reach the trust question and therefore make no determinations with respect to duties which the government may have as a result of the general trust relationship that exists between the United States and the Indians. See *Seminole Nation v. United States*, 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942).

We note also that because the Indians here are not seeking money damages against the United States, as did plaintiffs in *United States v. Mitchell*, we are not confronted with the jurisdictional dilemma that faced the Court in *Mitchell*.