Maurice ADAMS and Ellison
Jackson, Plaintiffs,

v.

Donald P. HODEL, et al., Defendants.

Civ. A. No. 85–1872.

United States District Court,
District of Columbia.

July 11, 1985.

Henry J. Sockbesen, Native American Rights Fund, Washington, D.C., and Michael D. Mason, Idaho Legal Aid Services, Inc., Indian Law Unit, Coeur d'Alene, Idaho, for plaintiffs.

George P. Williams, Asst. U.S. Atty., Washington, D.C., for Federal defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

On March 29, 1985, the Bureau of Indian Affairs (BIA) issued a final rule [1] amending the definition of "need" in the regulations used to calculate payment rates under the Indian General Assistance Program.[2] Plaintiffs, who are indigent Indian General Assistance recipients residing in Idaho and Nevada, sued to enjoin the enforcement of the new regulation on the grounds that it violates the Snyder Act of 1921 [3] and the equal protection component of the Fifth Amendment's due process clause. On June 12, 1985, the Court issued a temporary restraining order enjoining defendants from enforcing the new regulation and requiring them to make General Assistance payments based on the standard previously in force.[4] The parties have now filed cross-motions for summary judgment and the Court has heard oral argument. After carefully considering the submissions of the parties, the Court concludes that the government's motion must be granted and this action dismissed.

## I

The material facts are not in dispute. The General Assistance program is a federally funded public assistance program of last resort that pays benefits to indigent Indians living on or near reservations who are ineligible for other forms of public assistance provided by states in which they reside.[5] The program has been in place for some forty years in states that do not have their own special Indian assistance programs.[6] Under regulations that have remained essentially unchanged since the inception of the General Assistance program, the BIA has set the "need" level for General Assistance recipients at the Aid to Families with Dependent Children (AFDC) subsistence "need" level established by the state in which the General Assistance recipient resides. Thus, each General Assistance recipient has received benefits at 100 percent of his state's calculated subsistence "need" level.

The new regulation under challenge here modifies this direct tie between AFDC "need" levels and General Assistance "need" levels. Under the new regulation, in states that employ the so-called "rateable reduction" and therefore do not actually pay AFDC benefits at 100 percent of need, the General Assistance "need" level is based not on the state's AFDC need level, but on the actual payment rate. Consequently, for Indians such as plaintiffs, who live in states that employ the rateable reduction and therefore do not provide public assistance payments at the full, state-es-

1.  50 Fed.Reg. 12527 (1985).

2.  25 C.F.R. § 20.1(s) and (w).

3.  42 Stat. 208, codified at 25 U.S.C. § 13.

4.  On June 25, 1985, the Court approved a stipulation by the parties that (1) extended the temporary restraining order for an additional ten days, until July 2, 1985, and (2) provided that defendants would voluntarily comply with the terms of the temporary restraining order for an additional twenty days after the July 2 expiration date, or until the Court ruled on the parties' cross-motions for summary judgment, whichever occurred first. The Court also issued an Order on June 25 that modified the original

Order to take account of unavoidable delays in implementing the required reversion to the old General Assistance benefits payment standard by requiring that payments calculated under that standard for the period the temporary restraining order was in effect would have to be reflected in General Assistance checks issued on or after July 14, 1985.

5.  See *Morton v. Ruiz*, 415 U.S. 199, 208, 94 S.Ct. 1055, 1061, 39 L.Ed.2d 270 (1974); M. Price and R. Clinton, *Law and the American Indian*, (Michie Co. 1983) at 522–23, quoting from R. Wolf, "Needed: A System of Income Maintenance for Indians," 10 Ariz.L.Rev. 553 (1968).

6.  Price and Clinton, *supra* note 5.

tablished subsistence level, the effect of the new regulation will be to reduce their benefits significantly.[7] On the other hand, Indians residing in states that actually pay benefits at 100 percent of the state calculated AFDC need level will continue to receive General Assistance payments based on 100 percent of the need level. The crux of the plaintiffs' challenge to the new regulation is that this resulting disparity in payment rates for Indians living in different states is irrational and violates both the equitable distribution requirement of the Snyder Act, the relevant organic statute, and the equal protection component of the Fifth Amendment's due process clause.

## II

In evaluating plaintiffs' Snyder Act claims, it is appropriate to begin with the statutory language. As the Supreme Court has recognized, the Snyder Act is nothing more than a generally worded appropriations authorization statute that vests broad discretion in the Secretary of the Interior to administer Indian assistance programs funded by Congress. See *Morton v. Ruiz*, 415 U.S. 199, 205–12, 94 S.Ct. 1055, 1059–63, 39 L.Ed.2d 270 (1974). The relevant language of this brief[8] statute provides only that

> The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes:
>
> General support and civilization, including education.
>
> For relief of distress and conservation of health. . . .

25 U.S.C. § 13. Clearly, nothing in this vague authorizing language requires the Secretary to use the traditional formula for calculating need under the General Assistance program—or, indeed, even to establish such a program.[9]

Plaintiffs contend that, notwithstanding the absence of explicit statutory language, the new regulation violates both the agency's longstanding construction of the statute, see *Norwegian Nitrogen Co. v. United States*, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933), and a judicially recognized equitable distribution requirement implicit in the statute. See *Rincon Band of Mission Indians v. Harris*, 618 F.2d 569 (9th Cir.1980). Thus they argue that the new rule is invalid because the BIA has failed to provide a clear statement of the factual basis for its changed construction of the Snyder Act, thereby violating Administrative Procedure Act requirements for reasoned decisionmaking,[10] and because the new rule will illegally discriminate among Indians based on their state of residence.

## A.

In support of their argument that the BIA has failed to provide an adequate statement of reasons for the rule change, plaintiffs assert that the BIA improperly based its decision to change the need rule on isolated language in a congressional Appropriations Committee report. Noting that implied repealers of substantive statutes by subsequent appropriations authorizations are strongly disfavored, see *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978), plaintiffs contend that, in relying solely on this committee report lan-

---

7. Thus, plaintiff Adams, a Kootenai tribe member residing in Idaho, which makes payments based on a calculation using only 55 percent of its AFDC standard of need, will have his General Assistance allotment reduced from $146 to $80 per month. Plaintiff Jackson, a Shoshone-Paiute resident of Nevada, which pays 82 percent of its standard of need, will experience a reduction from $173 to $141.70 per month.

8. The statute occupies the space of approximately one page of the U.S.Code Annotated.

9. Indeed, although the Snyder Act was passed in 1921, the General Assistance Program was not established until 1944, more than twenty years later. See Price and Clinton, *supra* note 5, at 522–23.

10. 5 U.S.C. § 706(2)(A).

guage to justify the rule change, the Secretary failed to comply with the requirements for reasoned decisionmaking. Plaintiffs' argument is both factually and legally flawed.

■ As the BIA noted in its publication of the final rule, in 1982 the congressional Conference Committee on Appropriations explicitly and unambiguously directed the BIA to adopt the new rule.[11] The Supreme Court has recognized that such directions from the Appropriations Committee govern the operation of the General Assistance program under the Snyder Act—which is, as has been noted previously, a very broadly worded appropriations authorization statute. See *Morton v. Ruiz*, 415 U.S. at 205–12, 94 S.Ct. at 1059–63. However problematic may be the establishment and ongoing congressional supervision of a complex social welfare program by means of annual congressional appropriations decisions, *cf. Morton*, 415 U.S. at 208, 94 S.Ct. at 1061, the BIA's reliance on explicit directions contained in the Appropriations Committee report, its usual source of directions, can hardly be said to have been improper.[12]

■ It is also clear that, contrary to plaintiffs' assertions, both the BIA and Congress identified changed factual circumstances that could justify a departure from the traditional rule requiring General Assistance payments to be made at 100 percent of the state-established need level. As the BIA explained in its publication of the final rule, the passage of the 1981 Omnibus Budget Reconciliation Act (OBRA)[13] resulted in many changes in the AFDC program and concomitant changes in state calculations of their standards of need.[14] In particular, many states significantly increased their standards of need to permit poor families to continue to qualify for Medicaid services, while using the rateable reduction to avoid a concomitant increase in total state AFDC expenditures.[15] Thus, many states increased their need standards to increase (or maintain) eligibility for social welfare programs, while simultaneously departing from the traditional practice of making public assistance payments at 100 percent of need.[16] This

---

**11.** The summary accompanying the final rule stated that:

> The Bureau is also amending existing Financial Assistance and Social Services Program regulations to implement changes as directed by the congressional directive in the Fiscal Year 1983 Appropriations Conference Report No. 97–978, dated December 17, 1982. The report states on page 20 that: "The managers direct the Bureau [of Indian Affairs] to move expeditiously to implement changes in the general assistance program to bring payments into conformance with State payments in those states where the standard of need exceeds actual payments. The regulations shall provide flexibility for the Bureau to adjust payments as such payments may be adjusted by the States."

50 Fed.Reg. 12,527.

**12.** This rather unique system of congressional oversight and direction of the General Assistance program renders this case readily distinguishable from *TVA v. Hill, supra,* and the other cases cited by plaintiffs for the proposition that appropriations bills do not have the force of law and that committee reports are entitled to little weight as indicia of legislative intent. For example, in *TVA v. Hill,* the court held that subsequent congressional funding of the Tellico Dam could not be considered to have effected an implied repealer of the Endangered Species Act, which was otherwise applicable to that project. 437 U.S. at 191, 98 S.Ct. at 2300. This case, in contrast, does not involve an alleged implied repealer of specific, detailed legislation by a subsequent, completely unrelated appropriations bill; rather, it involves the use of annual appropriations legislation to give substantive content to an appropriations authorization statute which only derives its content from annual appropriations measures. Thus, *TVA v. Hill* and the other cited cases are simply not in point.

**13.** P.L. 97–35.

**14.** See 50 Fed.Reg. 12528.

**15.** See American Public Welfare Association, *Memorandum W–28* (December 28, 1982). The APWA report is specifically cited in the publication of the final rule, see 50 Fed.Reg. 12528.

**16.** *Id.* at 1. The APWA report also noted that "Since October 2, 1982, when OBRA took effect, 21 states have raised their need standards and 20 have increased their payment standards." *Id.* Plaintiff Jackson's home state of Nevada is among those cited as having increased their payment standards. *Id.* at 2. Nationwide AFDC need standard statistics compiled in 1984 for the

change in the traditional calculation of state public assistance need and benefits payment levels, to which the General Assistance payments historically have been linked, was specifically discussed in the BIA rulemaking and therefore constitutes a clearly stated, rational factual basis for the rule change. See *ILGWU v. Donovan,* 722 F.2d 795, 813–26 (D.C.Cir.1983).

### B.

The procedural adequacy of the BIA's rule change notwithstanding, it would obviously be vulnerable to attack on substantive grounds if, as plaintiffs allege, it violated the Snyder Act. As noted previously, the Snyder Act says nothing whatever about the General Assistance program or the precise level at which General Assistance benefits are to be calculated and paid. Plaintiffs contend, however, that the equitable distribution requirement recognized in *Rincon Band of Mission Indians v. Harris,* 618 F.2d 569, 573 (9th Cir.1980), mandates the payment of General Assistance at the need level set by each state. They allege that only this method of calculation—the one historically used by the BIA—will result in equal treatment of the Indian General Assistance recipients in the various states by providing each of them

with what have been determined to be subsistence level payments in each state.

The critical flaw in this argument is that it fails to take account of the changes in the calculation of state need levels that were noted by Congress and the BIA, as has been explained above. The unlinking by many states of their need and payment standards, and their concomitant increase in need standards, represented a departure in these states from the traditional use of the need standards and created a disparity among the various states in the calculation of public assistance benefits payments. Continued BIA adherence to the state need standards in calculating General Assistance benefits would have incorporated this disparity into the calculation of Indian General Assistance payments. Thus, Indian General Assistance recipients living in states that had raised their need standards, but not their actual AFDC payment levels, would have obtained significant increases in their General Assistance payments, while their counterparts in states that did not make such changes would have experienced no increase in benefits.[17] Assuming that the former rule complied with the equitable distribution requirement, as plaintiffs implicitly claim it does,[18] continued

House of Representatives' Committee on Ways and Means indicate that the AFDC standard of need in plaintiff Adams' home state of Idaho increased from $421 for a family of four in July, 1980 to $627 in January, 1984—an increase of nearly 49 percent. Deft.Ex. 6, Table 7, at 304. An examination of the standard of need statistics in the table also indicates that the Idaho AFDC standard of need is the tenth highest in the nation, and that the above-noted 49 percent increase in that need standard from 1980 to 1984 was among the highest recorded, in both absolute and percentage terms.

**17.** For example, the calculation of plaintiff Adams' General Assistance payments would have reflected the 49 percent increase in Idaho's need standard between 1980 and 1984, while plaintiff Jackson's General Assistance payments would have remained constant, reflecting Nevada's failure to change its AFDC need standard between 1980 and 1984. See Deft.Ex. 6, Table 7, at 304; see also note 16, *supra.*

**18.** At oral argument on the motions for summary judgment, plaintiff's counsel suggested for

the first time that, since the various states vary significantly in the frequency and generosity with which they compute their AFDC need standards, the former, longstanding General Assistance regulation linking General Assistance payments to state AFDC need standards might also violate the equitable distribution requirement and the due process clause of the Fifth Amendment. He suggested that the Court should require the BIA to undertake studies to establish statistically valid comparative subsistence standards for each of the 50 states. However, nothing in the language or history of the Snyder Act obligates the BIA to undertake such sophisticated comparative studies, nor does the Constitution do so. See *infra,* page 365. Accordingly, however, desirable such studies might be in establishing more precise determinations of need among indigent Indians in the various states, the Court has no authority to require the BIA independently to undertake such studies and make such determinations rather than relying on state statistical calculations of need and subsistence.

adherence to the old rule itself have violated that requirement.

■ In contrast, the use of actual state payment levels (the rateable reduction) will ensure that all General Assistance recipients continue to receive assistance at the level of public assistance actually paid by the state of residence. This approach is a rational accommodation to the new disparity in the calculation, and changed purpose, of state need standards, and it is also entirely consistent with the General Assistance program's traditional purpose of providing needy Indians who do not qualify for public assistance in their states with subsistence benefits comparable to those provided under the state-funded programs. That being so, the Court cannot conclude that the new payment standard is inconsistent with the purposes of the Snyder Act or will result in a clearly irrational, inequitable distribution of General Assistance funds in violation of the Snyder Act. See *Morton v. Ruiz*, 415 U.S. at 230–31, 94 S.Ct. at 1072; *Rincon Band*, 618 F.2d at 572–73.[19]

### III

■ Plaintiffs have also argued that, even if the challenged regulation was validly adopted and is consistent with the Snyder Act, it violates the equal protection requirements of the Fifth Amendment. To establish a Fifth Amendment due process—equal protection violation, plaintiffs must show that the challenged classification (1) invidiously discriminates against them, and (2) is not rationally related to the purposes of the General Assistance program. See *Weinberger v. Salfi*, 422 U.S. 749, 768–70, 95 S.Ct. 2457, 2468–69, 45 L.Ed.2d 522 (1975). Plaintiffs have not satisfied either prong of this test.

First. It is clear that in application the new standard treats all Indian General Assistance recipients identically, its disjunctive language notwithstanding.[20] Under the new regulation all needy Indians qualifying for General Assistance are entitled to benefits based to their state's actual AFDC payment rate. To be sure, the new regulation defines this actual payment rate differently, depending on whether or not the state equates need and payment or uses the rateable reduction. But this difference in formal definitions cannot obscure the fact that, as a practical matter, the new regulation places all needy Indians in a position equal to their indigent white counterparts. Thus, plaintiffs have failed to establish that the challenged regulation invidiously discriminates against them.[21]

■ Second. Even if one accepts plaintiffs' assertion that the challenged regulation treats similarly situated Indians differently, any disparity in treatment is directly and rationally related to the purposes of the General Assistance program. As noted previously, the avowed purpose of the General Assistance program is to serve as a

---

**19.** *Rincon Band, supra,* plaintiffs' primary authority for the proposition that the new regulation violates the Snyder Act, is readily distinguishable from this case. In *Rincon Band,* the court found that the BIA's allocation of approximately one percent of its Indian Health Service funds and facilities to services for eligible California Indians, who constituted approximately 10 percent of the population eligible for such services, irrationally discriminated against the California Indians in violation of the equitable distribution requirement implicit in the Snyder Act. 618 F.2d at 571–73. No such clear disparity in allocation of funds has been established here. Moreover, the allocation formula in *Rincon Band* was found to be completely irrational and to have been implemented without either explicit direction or implicit acceptance by the Congress. *Id.* at 573–75. Here, in contrast, the BIA has adopted a new regulation, which appears to be a rational means of estimating comparative need levels among indigent Indians, in response to explicit directions from the Congress.

**20.** The new regulation amends the existing regulation, 25 C.F.R. § 20.1(s), which provides that "need" for General Assistance purposes shall be calculated using the recipient's state AFDC need standard, by adding the following sentence: "However, in any State where the level of payment is less than the standard of need, the Bureau shall use the level of actual payment in determining the amount of financial assistance to be provided to the applicant or recipient residing in that State." 50 Fed.Reg. 12529.

**21.** See *supra* notes 16 and 17.

program of last resort that will provide needy Indians with public assistance benefits equivalent to those they would receive if they qualified for state public assistance benefits. Tying the General Assistance payment rates to actual state public assistance payment rates is an obvious and rational means of achieving this purpose of ensuring equivalence in AFDC and General Assistance payment rates within a state, and the comparability of General Assistance payment rates in different states.

Finally, it should be noted that under plaintiffs' theory the former BIA regulation is no less constitutionally infirm than the regulation challenged here. The gravamen of plaintiffs' constitutional claim is that state calculated need and benefits payment standards inevitably reflect state political and fiscal concerns to some extent and therefore cannot constitute valid standards for calculating benefit rates for a federally funded public assistance program of nationwide application. Although plaintiffs concede that such a program may take into account variations in the cost of living in various localities, they insist that the due process clause requires the federal government to establish its own statistically valid standard for calculating equitable payment, and that it cannot rely on state standards that are calculated independently and which may not always be precisely comparable. The Supreme Court repeatedly has held, however, that state social welfare regulations need not operate with absolute precision so long as the standard used is rationally related to the purposes of the program and is reasonably accurate. See *Salfi, supra; Dept. of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1969). The Court concludes that actual state public assistance benefit need and payment levels are sufficiently accurate statistical proxies for state subsistence levels to withstand this deferential level of constitutional scrutiny.

### IV

Plaintiffs have challenged the BIA's new regulation because they believe that it will result in significantly reduced General Assistance benefits and increased hardship for themselves and for many other indigent Indians across the country. They may well be correct, as the Court noted in granting their motion for a temporary restraining order. But however painful may be the reductions in benefits occasioned by the new regulation, the Court cannot conclude that it violates the Snyder Act or the Fifth Amendment. Accordingly, the government's motion must be granted, and this action must be dismissed.